Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

FILED _____ _____
ENTERED _____
_____ COUNSEL _____ OF RECORD

OCT 13 2022

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY: _____ KN _____

# UNITED STATES DISTRICT COURT

for the

SOUTHERN District of NEVADA

CIVIL Division

| | |
|---|---|
| ENOMA IGBINOVIA | ) ) ) ) ) ) ) ) |
| *Plaintiff(s)* | |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |
| **-v-** | ) ) ) ) ) ) ) ) ) ) ) |
| WILLIAM HEHN, et al., | |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |

Case No. 2:22-CV-01383-JAD-EJY

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☑Yes ☐No

## AMENDED
## COMPLAINT FOR A CIVIL CASE

### I.   The Parties to This Complaint

#### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | ENOMA IGBINOVIA |
| Street Address | 8608 COPPER FALLS AVENUE |
| City and County | LAS VEGAS, CLARK COUNTY |
| State and Zip Code | NEVADA 89129 |
| Telephone Number | 702-945-9906 |
| E-mail Address | nomaigbinovia214@icloud.com |

#### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

    Name                          D. SACRA

    Job or Title *(if known)*     Metro Police Officer, PN 5431/NWAC31

    Street Address            Unknown At This Time.

    City and County          Unknown At This Time./Las Vegas, Clark County

    State and Zip Code       Unknown At This Time./Nevada

    Telephone Number       Unknown At This Time.

    E-mail Address *(if known)*   Unknown At This Time.

Defendant No. 2

    Name                          M. CHAPARIAN

    Job or Title *(if known)*     Metro Police Officer, PN 4039/NWAC 31

    Street Address            Unknown At This Time.

    City and County           Unknown At This Time./Las Vegas, Clark County

    State and Zip Code       Unknown At This Time./Nevada

    Telephone Number       Unknown At This Time.

    E-mail Address *(if known)*   Unknown At This Time.

Defendant No. 3

    Name                          R. BERNI

    Job or Title *(if known)*     Metro Police Officer, PN 1488/NWAC 31

    Street Address            Unknown At This Time.

    City and County           Unknown At This Time./Las Vegas, Clark County

    State and Zip Code       Unknown At This Time./Nevada

    Telephone Number       Unknown At This Time.

    E-mail Address *(if known)*   Unknown At This Time.

Defendant No. 4

    Name                          Jane Doe (Name Is Unknown At This Time)

    Job or Title *(if known)*     Unit-5, Caseworker Nevada Depart of Corrections

    Street Address            Southern Desert Correctional Center
                                Unknown At This Time

    City and County           Unknown At This Time./Las Vegas, Clark County

    State and Zip Code       Unknown At This Time./Nevada

    Telephone Number       Unknown At This Time

    E-mail Address *(if known)*   Unknown At This Time

Defendant No. 5

| | |
|---|---|
| Name | John Doe (Name Is Unknown At This Time) |
| Job or Title (if Known) | Unit - 5, Caseworker SDCC/NDOC |
| street Address | Unknown At This Time. |
| City And County | Unknown At This Time./Las Vegas, Clark County |
| state And Zip Code | Unknown At This Time./Nevada |
| Telephone Number | Unknown At This Time |
| E- Mail Address (if Known) | Unknown At This Time |

Page 2$^A$ of 5

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☑ Federal question          ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

**A.      If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

8th And 14th Amendment Rights of The United state Constitution.

**B.      If the Basis for Jurisdiction Is Diversity of Citizenship**

1.      The Plaintiff(s)

a.      If the plaintiff is an individual

The plaintiff, *(name)* _____ , is a citizen of the State of *(name)* _____ .

b.      If the plaintiff is a corporation

The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ , and has its principal place of business in the State of *(name)* _____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.      The Defendant(s)

a.      If the defendant is an individual

The defendant, *(name)* _____ , is a citizen of the State of *(name)* _____ .  Or is a citizen of *(foreign nation)* _____ .

Page 3 of 5

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

    b.       If the defendant is a corporation

           The defendant, *(name)* _____ , is incorporated under

           the laws of the State of *(name)* _____ , and has its

           principal place of business in the State of *(name)* _____ .

           Or is incorporated under the laws of *(foreign nation)* _____ ,

           and has its principal place of business in *(name)* _____ .

           *(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

    3.      The Amount in Controversy

           The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

This claim Is Based On Metro officers Introducing And Using A Known Fabricated Evidences To Conduct Their Investigation Against Plaintiff On 10/23/1997, Resulting Into Fabricated charges And Ultimately Convictions. Please See Attached Indepth Complaint For Full Details.

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Monetary Relief. Please See Attached Indepth Complaint For Full Details.

## V.      Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:     10/12/2022

Signature of Plaintiff     _Enoma Igbinovia_

Printed Name of Plaintiff     _ENOMA IGBINOVIA_

### B.      For Attorneys

Date of signing:     _____

Signature of Attorney     _____

Printed Name of Attorney     _____

Bar Number     _____

Name of Law Firm     _____

Street Address     _____

State and Zip Code     _____

Telephone Number     _____

E-mail Address     _____

ENOMA IGBINOVIA
8608 Copper Falls Avenue
Las Vegas, NV. 89129
          Plaintiff In Pro Se

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

ENOMA IGBINOVIA,
         Plaintiff,

Vs.

D. SACRA, INDIVIDUALLY
AND OFFICIALLY, M. CHAPARIAN,
INDIVIDUALLY AND OFFICIALLY,
R. BERNI, INDIVIDUALLY AND
OFFICIALLY, JANE DOE,
INDIVIDUALLY AND OFFICIALLY,
JOHN DOE, INDIVIDUALLY AND
OFFICIALLY
         Defendants.

CASE No.: 2:22-CV-01383-JAD-EJY

## AMENDED
## CIVIL RIGHTS COMPLAINT,
## JURY DEMAND, RULE 38

## I
## PARTIES

The Plaintiff Is: ENOMA IGBINOVIA, 8608 Copper Falls Avenue, Las Vegas, NV. 89129. The Defendants Are: D. SACRA, PN 5431/NWAC31, Metro Police Officer On Date Complained of, State Employee, Individually And Officially; M. CHAPARIAN, PN 4039/NWAC31, Metro Police Officer On Date

-1-

Complained of, state Employee, Individually And officially; R. BERNI, PN 1488 /NWAC 31, Metro Police officer On Date Complained of, state Employee, Individually And officially; Jane Doe, Caseworker Nevada Department of Corrections On Date Complained of, state Employee, Individually And officially; JOHN DOE, Corrections officer, Nevada Department of Corrections On Date Complained of, state Employee, Individually And Officially

## II
## JURISDICTION

Plaintiff Is A Resident of clark County, las Vegas, Nevada, where The Acts/omission Complained of occurred. The Defendants Are Employees of The state of Nevada on The Date Complained of. The violations Began And Occurred In Las Vegas, Nevada. Based on These Facts This Court Has Jurisdiction In This Action. This Complaint Is Brought Pursuant To The Civil Rights Act, Title 42 U.S.C. § 1983.

## III
## ALLEGATION

All Named Defendants (metro Police officers) On The Date Complained of Intentionally, willfully, Knowingly, willinlly And Deliberately Engaged In The Conduction of A Known Mock Investigation leading To The state charges They Brought Against The Plaintiff. And The Conviction of The Plaintiff of Those Same charges As A Result of The Mock Investigation.

-2-

Where Plaintiff Had To Serve 23 Calendar Years In Prison Based On Defendants' Fabricated Evidences Introduced And Used In Their Investigation, Or should Have Known That The Evidences Used In Their Investigation Was Fabricated And Never Existed During Their Mock Investigation.

"AS A MATTER OF FACT", Defendants Knowingly Conducted A Mock Investigation And Intentionally Fabricated The Only Evidences That Was The Only Basis Of Their Investigation Against The Plaintiff.

In Addition And As A Matter of Fact, The Defendants Deliberately Represented The Known Fabricated Evidences As True And Having Personal Knowledge And Possession Of The Fabricated Evidences To The Jury At Trial. Same Evidences Was The Only Evidences And Basis of The charges Defendants lodged Against Plaintiff, which Ultimately lead To The charges And Convictions Of The Plaintiff where Plaintiff Had To Serve 23 years Flat In Prison Based On Defendants' Mock Investigation. And Defendants were Fully Aware Or should Have Been Aware That The Evidences Which Was The ONLY BASIS of The charges And Convictions Was Fabricated, And That Plaintiff Was Innocent. Despite This Knowledge, Defendants Continued Their Investigation And Charged And Convicted Plaintiff of The Resulting charges From Their Mock Investigation And Sent Plaintiff To Prison Depriving Plaintiff of His Liberty For 23 years. In Violation of Plaintiff's 14th Amendment Of The United States Constitutional Due Process Right.

Devereaux V. Abbey, 263 F.3d 1070, 1074-75 (9th Cir

-3-

2001); Miller V. Pate, 386 U.S. 1, 7 (1967). Plaintiff Has A 14 Amend., Constitutional Due Process Right Not To Be Subjected To Criminal Charges On The Basis Of False Evidence That Was Deliberately Fabricated By The Goverment. In This Instant Case, That Was Precisely What Happened To The Plaintiff By The Hands of Defendants.

On 10/27/1997, Plaintiff ENOMA Iqbinovia, Was Arrest Along With Codefendant By The Name Of Cecil L. Harvey (Codefendant), For The Alleged Information/Crimes of Count I - Burglary While In Possession Of A Firearm (Felony -NRS 205-060); Count II - First Degree Kidnapping With Use of A Deadly Weapon (Felony - NRS 200.310, 200.320, 193.165); Count III - Conspiracy To Commit Robbery (Felony - NRS 199.480, 200.380); Count IV - Robbery With Use Of A Deadly Weapon (Felony - NRS 200.281); Count VII - Coercion With Use Of A Deadly Weapon (Felony NRS 207.10, 193.165); And Count VIII And IX - Possession Of Firearm By Ex-Felon (Felony— NRS 202.360), Allegedly Committed On The 23rd Day of October, 1997. All Charges Stemmed From One Alleged Act As Case No. C-146894-2

All Above Charges Above Were The Results of Defendants Alleged Investigation where Defendants Knew Or Should Have Known That Their Investigation Was Based On Fabricated Evidences or Would Yield False Evidences Due To The Method They Used.

On The 3rd Day of December, 1997, Plaintiff And His Codefendant Entered A Plea of Not Guilty To The Alleged Above Crimes.

Plaintiff And His Codefendant Were Both offered A Plea Deal

-4-

By The Prosecutor, That All charges (9 In Total) Would Be Dismissed If Plaintiff And His Codefendant Plead Guilty To A Robbery. Plaintiff And His Codefendant Turned Down The Plea Deal Because Plaintiff And His Codefendant Were Not Guilty of The Above Alleged Crimes And Are Innocent of All charges.

Plaintiff And His Codefendant were Fully Convinced That The Truth Would Come To light During The Investigation of The Crimes. Which Is That Plaintiff And His Codefendant Are Innocent of All charges. Because Plaintiff And His Codefendant Did NOT COMMIT Any of The Above Alleged Crimes They were charged And later Convicted of.

Plaintiff And His Codefendant went To The Alleged Victims House Jose Villanueva To Purchase Some Marijuana For Recreational Use As Plaintiff Had Done Countless Number of Times Prior To The Night of The Alleged Crimes on 10/23/1997. On Many And Countless Occasions, Plaintiff Had Been To The Alleged Victim Jose Villanueva's Apartment To Purchase marijuana. Plaintiff And His Codefendant Made This Fact Known To The Police officers During Their Alleged Investigation. That The Reason Plaintiff And His Codefendant Went Over There To The Alleged Victim's Apartment Was To Purchase Some marijuana As Plaintiff Had Done Numerous Times. That The Alleged victim Jose Villanueva Invited Plaintiff And His Codefendant Over To His Apartment For The Purpose of Plaintiff Purchasing marijuana From The Alleged victim As Plaintiff Had Done Numerous Times Prior To 10/23/1997. And That The Alleged Victim were Suppose To Be Friend Until That Night of The Alleged Incident On 10/23/1997. And That Plaintiff And His Codefendant Did Not Rob The Alleged Victim Joe

-5-

Villanueva Or Anyone Else For Anything. Defendants Were Fully Aware Or should Have Been Fully Aware That The Alleged Victim Did Not own Any Guns And That No Guns Were Ever Taken From The Alleged Victim And Plaintiff And His Codefendant Did Not Take Any Gun(s) From The Alleged Victim. In light of This Knowledge By Defendants, They Continued Their Alleged Investigation Against Plaintiff And His Codefendant. Where Defendants Fabricated Evidences Against Plaintiff.

The Police Report stated That The Alleged Victim Joe Villanueva (Victim), stated That On 10/23/1997, Two Unknown Black Males Knocked On His Apartment Door And when He Opened The Door They Forced Their way Inside Both Plaintiff And His Codefendant Holding Hand Guns. That The Two Unknown Black males were Plaintiff And His Codefendant. That After Plaintiff And His Codefendant Forced Their way Inside, They Asked Him For Guns And That Plaintiff And His Codefendant stole/Robbed Him For An SKS Rifle, A 410 And 12 Guage shotguns. The Alleged Victim Also claimed That Plaintiff Hit Him with The Handgun Plaintiff Allegedly Had. He Then claimed That After Plaintiff And His Codefendant Robbed Him For The Guns At Gun Point, He (The Alleged Victim) Then Grabbed A sword And chased After Plaintiff And His Codefendant who were According To The Alleged Victim In Posse-ssion of Handguns And His Guns Allegedly. see Attached Exhibit - 01 .

It should Also Be Noted By This Court That In Case Number C-146894-2, Plaintiff Enoma Igbinovia, was Defendant No.2, In The Case And His Codefendant Cecil L. Harvey was Defendant No.1, In The Case In Question. As Such, Plaintiff And His Codefendant Had A Joint Proceedings In The Case. Beginning

-6-

From Arrest, Booking, Arraignment, Preliminary Hearing, Trial, And sentencing, etc... In Case No. C-146894-2. And It Was Only After Sentencing In The Case That Plaintiff And His Codefendant Severed The Case And Began Filing Paperwork And Having Proceedings Individually For The Purpose of Appeal.

The Defendants (metro Police officers) In This Current Action Knowingly, Intentionally, willfully And Deliberately Created, Introduced And Used A Known Fabricated And False Evidences To Conduct Their Investigation And charge Plaintiff And Convicted Plaintiff of Crimes That Never occurred. At The Very least Defendants should Have Known That No Crime occurred And That Plaintiff was Innocent of The charges They lodged Against Plaintiff. Plaintiff was sentenced To Prison And Defendants were Fully Aware That The Resulting Effect of Their mock Investigation Method Would Yield Plaintiff loss of His liberty. Defendants Completely Disregarded The law They were sworn To Uphold As Law Enforcement officers. And Completely Disregarded Their Ethical standards. Where Plaintiff Had To Serve (23) Calendar Years.

During The Preliminary Hearing In The Case, The Police officers Sat In The Court Room And observed The Alleged Victim Testify To Fabricated Facts From The Defendants' Alleged Investigation Knowing Fully Well It Was False.

Furthermore, Defendants claimed That The Alleged Victim Gave Them The Receipt of The Alleged SKS Rifle That Was Allegedly stolen From The Alleged Victim And That He Also Gave Defendants The Serial Numbers To Each of The Alleged stolen Guns During Their Alleged Investigation. More Directly Defendants claimed During Their Investigation They Collected These Evidences. And That Such Evidences

-7-

Was In Their Possession. Defendants Further Represented This Facts To The Jury. Therefore, Establishing The Alleged Guns That Never Existed. Defendants Were Fully Aware That No Guns Ever Existed During Their Mock Investigation And That No SKS Rifle Receipt Was Ever Given To Them During Their Investigation And Defendants Were Also Fully Aware That No Serial Numbers To The Alleged Stolen Guns Were Ever Given To Them During Their Investigation Nor Did Such Evidences Ever Existed Or Ever Came To Light During The Investigation. However, Defendants Claimed They Were In Possession Of These Fabricated Evidences. And Represented This Fabrication To The Jury At Trial As Facts. No Guns Were Ever Found or Brought.

In Addition, Defendants Were Fully Aware or should Have Known During The Investigation That The Alleged Guns The Alleged Victim Claimed He Own Never Existed Because Not Only Did The Alleged Victim 'Not' Give Defendants Any SKS Rifle Receipt Or Any Serial Numbers To Any Guns, Which He claimed Were Allegedly Stolen. Defendants Are In charge And Control And maintain The Firearms Registration Data Base And should Have Known That No Guns Were Registered Under The Alleged Victim's Name. And The Guns The Alleged Victim Claimed He Own And Were Stolen Never Existed. Because Not Only Did The Alleged Victim Not Give Defendants Any SKS Rifle Receipt Or Any Serial Numbers To Guns He claimed Were Stolen (Although Defendants Represented He Did), Defendants Had Full Access To The Firearm Registration Data At Their Disposal And Could Have Easily Determine That No Guns Were Registered Under The Alleged Victim's Name or To The Alleged Victim.

-8-

Rather, Defendants Took A step Farther And Knowingly Fabricated Evidences In Their Investigation And Made This Representation To The Jury At Trial As Facts And As A Result of Their Investigation. Which Was That They claimed Possession And Personal Knowledge of The Alleged sks Rifle Receipt And Serial Numbers of The Alleged stolen Guns' Existense . Which As A matter of Fact Never Existed . Which Was Why Defendants Were Unable To Produce That Key Evidences of The Case When ordered To Produce During Plaintiff's Codefendant's Evidentiary Hearing To Produce Those Fundamental Records They claimed To Have obtained During Their Investigation . And Defendants chose To Quickly Release Plaintiff's Codefendant To obviate That Order To Produce The Records And the Evidentiary Hearing. See <u>Attached Exhibits - 03,09,04</u> .

This Court should Take Note That The Allege Guns **was** The Only Basis For Defendants' Investigation And the Resulting charges And Convictions of The Plaintiff .

No Gun **was** Found with The Plaintiff In light of The Search of Plaintiff's Home Nor linked To Him In Anyway .

As Previously Mentioned Above, During The Preliminary Hearing In The Case, The Alleged Victim lied About The Crime which He Falsely Claimed occurred And Testified To Under Oat. And lied About Everything That Happened on The Night of 10/23/1997 . He Lied About Being A Drug Dealer ( which Was The Reason we went There That Night To Purchase marijuana After He Invited Us over), He Lied About Drugs Being Present At His Apartment on The Night of The Allege Incident, About Plaintiff And His Codefendant Coming To His Apartment That Night For The Purpose of Purchasing marijuana After Plaintiff spoke with Him over

-9-

The Phone And Invited Plaintiff over For The Purchase of Marijuana. As Plaintiff Had Done Many Times Prior To 10/23/1997. The Alleged Victim claimed That Two Unknown Black males Knock On His Door And He Opened It And They Forced Their Way Inside His Apartment And stole His long Guns. He claimed He Never And Did Not own A Handgun In The House That Night on 10/23/1997, He claimed He Had Never met Plaintiff Before Until 10/23/1997. And claimed That He Gave The Receipt To The Alleged SKS Rifle And The serial Numbers To All The Guns Stolen To The Police And claimed That The Police Had Those Information. He Also lied And claimed That Plaintiff Hit Him In The Face With The Handgun Plaintiff Allegedly Had. And This Same Information Was Represented To The Jury.

What Is Worse Is The Fact That Defendants who Allegedly Conducted The Investigation Sat In The Court Room And witnessed The Alleged Victim Testify Falsely And Contrary To what The Defendants' Investigation Yielded. Rather Supported The Representation of The Bold Lies To The Court And Jury.

The Alleged Victim's Girl Friend Also Testified And Completely Contradicted The Alleged Victim's lies At The Preliminary Hearing Under Oat.

The Only Basis For Defendants' Investigation which Resulted Into Plaintiff's charges Lodged Against Him And Convictions Was The Alleged SKS Rifle, H10 And 12 Guage shotguns only. And The Alleged Information Defendants Used To Establish These Guns In The Investigation, That Is The Receipt And serial Numbers NEVER EXISTED. Defendants Intentionally, Willfully, Deliberately Introduced And Used A Known False Evidence And Known Perjured Testimony To Conduct And Conclude The Investigation Resulting Into The

— 10 —

charges Brought Against The Plaintiff And His Codefendant And Ultimately The Convictions.

While All Along Defendants were Knowingly suppressing The TRUTH Intentionally, Preventing Plaintiff's Ability To Defend Himself And Constitutional Rights. And All Along while Defendants were Knowingly Using Fabricated Evidences To Conduct Their Investigation leading up To Plaintiff's And His Codefendant's charges And Convictions. See Attached Exhibit-02

At The Preliminary Hearing, The Alleged Victim's Girlfriend who was Also Present There At The Apartment on 10/23/1997 stated Under Oat That Her Boyfriend The Alleged Victim Was A Drug Dealer And That There was Drugs Present In The Apartment That Night On 10/23/1997. She Further stated That She NEVER Saw Any Long Guns. She Also stated That Plaintiff Had Been To The Apartment Prior To 10/23/1997.

Defendants were Fully Aware Or Should Have Been Aware That Their Alleged Investigation Results was Inaccurate And False, But The Focus Of Defendants Investigation was Focused on Anything other Than The TRUTH. See Attached Exhibit-02

On 10/23/1997, After Plaintiff Got off work That Evening. He And A Friend From Work Decided To Purchase some Marijuana For Recreational use That Evening. Plaintiff Called The Marijuana Dealer Whom Plaintiff Had Always Purchased Marijuana From Everytime He Needed Marijuana. Who Is Also The Alleged Victim Jose Villanueva (Victim). Plaintiff Had Always Purchased Marijuana From The Alleged Victim Everytime He Wanted Marijuana Prior To 10/23/1997. After Plaintiff Called And Spoke To The Alleged Victim About Marijuana Purchase, The Alleged Victim Invited Plaintiff over To His Apartment For The Purchase of the Marijuana. Upon Arrival, Plaintiff And His

— II —

Codefendant Knocked On The Door. After A brief moment The Alleged Victim opened His Front Door And we spoke, Exchanged Greetings, etc. Immediately After Our brief Conversation, I Handed The Alleged Victim $100.00 For The Marijuana Purchase. The Alleged Victim Handed Plaintiff A Small Plastic Bag Containing Marijuana. Plaintiff Took The Marijuana Bag From Him. Plaintiff And His Codefendant started To Walk Away While Inspecting The Bag of Marijuana. It looked As If The Marijuana Bag Was Significantly Shorted. Plaintiff And His Codefendant Turned Around To Go Back To The Alleged Victim's Door After only Walking Only About 5-10 Feet Away From The Door. Plaintiff Knocked Again. And The Alleged Victim Opened The Door And Plaintiff Told Him He Would like To Place The Marijuana Bag On A scale To Ensure That The Entire Grams Was There. The Alleged Victim Refused And said That He Was Busy. Every Other Time Plaintiff Had Went To Purchase Marijuana From The Alleged Victim's Apartment, The Transaction Had Always Taken Place Inside His Apartment Kitchen Area. Where The Marijuana Bag Is Placed On A scale. Plaintiff Then Told The Alleged Victim That If He Didn't Allow Plaintiff To Place The Marijuana Bag On The scale To Ensure The Correct Grams Was There That He Didn't Want It. The Conversation Quickly Turned Into An Argument That Escalated Into The Alleged Victim Pulling Out A Handgun And Pointing It Towards Plaintiff And His Codefendant's Direction. But more Into Plaintiff's Face. He Became Very Belligerent And Was Cursing And Threatening To Shoot Plaintiff. Prior To The Alleged Victim Pulling That Handgun, Plaintiff Had Returned The Bag of Marijuana To The Alleged Victim After He Refused To Place It On A scale And It Was Shortly After That He Became Belligerent And Pulled The Handgun Out. As The Alleged Victim Began To lower The Handgun, Plaintiff's Codefendant Who Had Been Standing Slightly To The side But

-12-

Close To The Plaintiff Struck The Alleged Victim In The Facial Area Area with His Fist. He stumble Backward Into His Apartment living Room Area. He Had Been standing slightly By The Doorway of the Apartment. The Handgun He was Holding Flew off His Hands Back Towards Inside His Apartment living Room somewhere. A Fight Ensured And The Alleged victim then Ran All The Way Inside the living Room Area Screaming I Am Going To Kill You. Plaintiff And His Codefendant thinking He Was Going To Pick Up The Handgun That Flew off His Hand After Plaintiff's Codefendant Hit Him. Plaintiff And His Codefendant Ran Back To The Car with The Alleged Victim chasing After Them with A shiny object that was long. Plaintiff And His Codefendant Got Back Into The Car And Drove off. The Alleged Victim was Trying To chase the Car on Foot. Plaintiff And His codefendant lost Their $100.00 They Paid For The Bag of Marijuana And The shorted Bag of Marijuana. When Plaintiff Arrived Back Home, He Repeatedly Called The Alleged Victim over The Phone To Demand His $100.00 Paid For The Bag of Marijuana We left Behind But He Did Not Answer. Plaintiff Continue To Call Him Continuously over The Following Days of The Alleged Incident But The Alleged Victim Would Not Answer His Phone.

It was A Few Days later On 10/27/1997, when The Police Came To Plaintiff's Apartment He Had Just Moved Into And Broke The Front Door Down And Arrested Plaintiff For Robbery with The Use of A Deadly weapon And lesser Included Offenses. And It was After Defendants Completed Their Alleged Investigation They Added 6-7 Additional charges making The Total charges Brought Against Plaintiff 8 In Total. All stemming From One Act. which was That Plaintiff And His Codefendant Allegedly Took/stole Guns From The Alleged Victim

-13-

On The Night of 10/23/1997. After The Plaintiff was Placed In Handcuffs, A massive Search of Plaintiff's Apartment was Conducted By The Defendants (Metro Police officers). At The Time Plaintiff Not Knowing what They were Looking For, But Nothing Illegal was Found At Plaintiff's Apartment. see Attached Exhibit-01

Defendants Intentionally, willfully, Deliberately Created A Known False Evidences And Used Same To Corroborate The Alleged Victim's lies. During Defendants Investigation Resulting Into The charges And Convictions Against The Plaintiff Under A Known Pretext By The Defendants. The False Evidence Created And Used By Defendants During Their Alleged Investigation was The Only Basis For All Defendants' Investigation And Resulting charges And Convictions Against the Plaintiff. The Alleged Guns Never Existed, The Alleged SKS Receipt The Alleged Victim claimed He Gave To Defendants (Metro Police officers) For One of The Alleged Guns He Claimed Plaintiff Robbed Him For Never Existed (Although Defendants claimed Possession of It During Their Alleged Investigation) And Also The Alleged Serial Number Allegedly which The Alleged Victim claimed He Gave To Defendants (Although Defendants claimed they Had Possession of This Evidences) Never Existed.

Defendants Were Fully Aware Or should Have Known that These Alleged SKS Receipt And The Alleged Serial Numbers supposedly Belonging To The Alleged Long Guns Plaintiff was Accused of Robbing Alleged Victim For NEVER EXISTED. MATTER OF FACTLY SPEAKING DEFE- NDANTS WERE FULLY AWARE FROM THE OUTSET THAT SUCH EVIDENCE NEVER EXISTED. DURING

-14-

THEIR ALLEGED INVESTIGATION. HOWEVER, THEY CHOSE TO FABRICATE THESE INFORMATION. AS SUCH, FABRICATING THE EXISTENCE OF THE ALLEGED GUNS FOR THE PURPOSE OF THEIR INVESTIGATION AND THE RESULTING CHARGES AND CONVICTIONS AGAINST PLAINTIFF.

PLAINTIFF AND HIS CODEFENDANT NEVER TOOK ANY GUNS OR ANYTHING FROM THE ALLEGED VICTIM.

During Plaintiff's Codefendant's Appeal Post Trial, Something Very Interesting Happened In The Case's Proceedings which Plaintiff Will Explain Briefly Below In This Complaint.

As Previously mentioned Above, Plaintiff And His Codefendant Had A Joint Proceedings From The Resulting charges lodged Against Plaintiff And His Codefendant From Defendants (metro Police officer) Investigation. Beginning From Arraignment, Through Trial, Until After Sentencing In the Case. After The Convictions of Plaintiff And His Codefendant In May 1993, Plaintiff And His Codefendant Severed Their Case And Began Filing Their Appeal Separately. In May of 2005, Plaintiff's Codefendant Was Abruptly Released During The Proceedings of His Evidentiary Hearing By The Prosecuting District Attorney. The Nevada Supreme Court Ordered The Evidentiary Hearing After A Review of The Case. See Attached Exhibit-04.

Plaintiff Codefendant's Evidentiary Hearing In The Case Finally Threatened To Expose Defendants' Fabricated Evidences Intentionally Used As Basis For Their Mock Investigation which Ultimately lead To The Resulting charges And Convictions of the Plaintiff And His Codefendant. This Fabricated Evidences (The Gun Records And Receipt And Serial Numbers of The Alleged Guns

-15-

Plaintiff And His Codefendant were Accused of Robbing The Alleged victim of Including The Guns And The Alleged medical Records) Never Existed. But was Falsely Represented By Defendants As Basis For The Investigation And As A Result, The Following charges And Convictions where Plaintiff served 23 years Flat of Incarceration.

At All Times During All Proceedings of The Case Defendants (metro Police officers) claimed The Above Evidences was In Their Possession And Custody And was The Fundament Basis of Their Investigation And The Resulting charges And Convictions of The Plaintiff And His Codefendant. see Attached Exhibit-03

Plaintiff Is Actually Innocent of The Investigation And Its Resulting charges And Conviction In Its Entirety.

After Plaintiff's Codefendant was Released In Early 2005, Based On The Fabricated Evidences From The Defendants' Investigation where Defendants Knowingly Fabricated And Used Known False Evidences which They Continue To Conceal At The Time of Plaintiff's Codefendant's Release In 2005, By Using Nunc Pro Tunc As A Method.

Plaintiff Retained A Private Counsel In Effort To Secure His Freedom As well. Because If A clerical Error Affects Plaintiff's Codefendant In The Case, It Would Also Affect The Plaintiff Because of The JOINT Procession. However, Plaintiff was Denied Application of same Release His Codefendant with whom He Had A Joint Trial Received. See Attached Exhibits - 05 And 06

Plaintiff Had To serve His Full Prison Term Given To Him As A Result of Defendants' Investigation. Where Plaintiff Served Twentythree (23) Calendar Years Based on Defendants Use of A Known Fabricated Evidences During Their Investigation. Plaintiff Now moves To Hold Defendants Accountable

-16-

For The Violations of Plaintiff's Constitutional Rights Under The Color of law.

Plaintiff served more Than 20 years Incarcerated. Plaintiff was Housed In The most Gruesome Living Conditions. Plaintiff was Stabbed multiple Times while In Prison By Gang members.

Plaintiff was Taking To The Prison sometime In 1998, Based On The Resulting charges And Convictions From Defendants' Investigation. that was Based On Known Fabricated Evidences. Around December of 1998 Plaintiff was moved From The County Jail House And Transported To The Prison Southern Desert Correctional Center (SDCC). Plaintiff was Housed With Another Inmate who was A Known Gang member In And Outside The Prison. Plaintiff Is Not Affiliated with Any Gang In Any way shape or Form. Throughout Plaintiff's Incaceration, He was Known And classified As No Gang Affiliation Inside And Outside Prison.

Plaintiff Began Having Problems with His cellmate A Known Gang member/leader. The Inmate would Use And Take Plaintiff's Property And Things. Plaintiff Addressed Him About His Behavior And Requested His cellmate to stop Using And Taking His Things without Plaintiff's Permission. The Room/cellmate Continue To Use And Take Plaintiff Property And Things. At One Point Plaintiff's cellmate Brought His Gang Member Friends To The Cell (Around 10 In Total) And They Threatened Plaintiff That They Would Stabb Plaintiff If Plaintiff Did Not stop Complaining To other Inmates About Plaintiff's cellmate Using And Taking Plaintiff's Things. After They All left, Plaintiff went

-17-

To The Unit-5, Housing officer In The Unit where Plaintiff Was Housed At The Time Complained of, And Explained Everything Plaintiff Had Experienced To Him. The Unit officer Called S∅E To The Unit For The Situation. Plaintiff Remembers Speaking To S∅E Senior officer By The name of Fisher. Plaintiff Explained His Situation As stated About And what He Had Experienced To Him. He Took Plaintiff To Unit-5 Caseworker's officer Who Was Incharge of The Unit Plaintiff Was Housed. Plaintiff Explained To He As Explained Above All what He Was Experiencing To The Caseworker. And Plaintiff Requested To Be moved out of That Cell To Avoid His Cellmate And To Be Placed In A Cell With A Non-Gang member As A cellmate. Unit-5, Caseworker Replied To The Plaintiff That she Would Look Into The matter. After A Few Days Passed, she called Plaintiff Into Her office And Told Plaintiff That Plaintiff Is Going To Have To Get Use To Having A cellmate While In Prison. And That Plaintiff Do Not Have The option of Picking Who His cellmate will Be. And That The Prison Picks who Plaintiff must House with. Plaintiff Told Her That He's A Non-Affiliated Person And should Be Housed With A Non-Affiliated Person As Well. The Caseworker Then Told Plaintiff That Plaintiff Could Refuse Housing And Face Disciplinary charges. she Then Ordered Plaintiff out of Her office. Plaintiff Do Not Remember Her Name At this Time And Is Referring To Her As Jane Doe At this Time.

It was A Few Days later When Plaintiff's cellmate Brought His Gang member Friends Back To The Cell while Plaintiff Was Asleep Because He Found out That Plaintiff Talked

-18-

To The officers And Unit-5 Caseworker And Requested To Move. Plaintiff was Jumped, Beating And stabbed Multiple Times. After They left, Plaintiff was Able (Through A lot of Pain And Aches with Everything Spinning) To Manage To Get To The Unit-5 officers' office And Asked For Help. Plaintiff was Rushed To The Prison Infirmary At SDCC where The Nurses In charge Quickly An Ambulance Because of The severity of one of The stabb Wounds. where Plaintiff was stabbed multiple Times On His Body In Addition To The Beating. And Plaintiff was Also stabbed One Times Through The Back of His Neck That Went All The Way Through Inside His Mouth. where Plaintiff was Bleeding Through The Inside of His Mouth From The Neck stabb Wound.

When The Ambulance Arrived, Due To The Severity of The Back of The Neck stabb Wound where Plaintiff was Bleeding From Inside of His Mouth, The Ambulance Called For Flight For Life Helicopter And Plaintiff was Flown To UMC In Las Vegas For Medical Treatment. where Plaintiff was Placed On life support Equipments For several Days. See Attached Exhibit-8

Plaintiff was Also Placed In solitary Confinement For seven (7) Consecutive Years straight For No legitimate Reason From 09/17/2009 — 08/25/2016 For Absolutely No legitimate Reason. Plaintiff was subjected To The Most Gruesome Living Conditions The state of Nevada Had To offer Its Inmates Beyond The Imagination of A Reasonable mind.

Plaintiff Now Points Out That If It Was Not For

-19-

Defendants' Known Use of Fabricated Evidence To Conduct And Conclude Their Mock Investigation Resulting Into The charges And Convictions That Followed, Plaintiff Would Never Had Faced And/or Experienced Any of These Cruelty And Atrocities. Therefore, Plaintiff seeks To Hold Defendants As Well As Other Responsible Parties Accountable.

Habeas Corpus Is No longer Available For This Remedy. As such, This Complaint should Be Allowed To Move Forward. Nonnette V. Small, 316 F.3d 872, 875-76 (9th Cir. 2002); Huang V. Johnson, 251 F.3d 65, 74 (2nd Cir. 2001), Igbinovia V. Dzurenda, 20-16259 (9th Cir. 2021).

## CAUSES OF ACTION

### First Cause of Action

Plaintiff Has A 14th Amendment United states Constitutional Right Not To Be Subjected To Criminal charges On The Basis of False Evidence That was Deliberately Fabricated By The Government. Defendants Known Use of A Known Or Fabricated Evidences To Conduct Their Investigation Resulting To charges And convictions Against Plaintiff Violates Plaintiff's 14th Amend. Constitutional Due Process Right.

Defendants (metro Police officers) were Fully Aware Or should Have Been Aware That The Basis of Their Investigation of Alleged Stolen Guns was False And Fabricated. Defendants' Knowledge of The False And Fabricated Evidences Used In Their Investigation And Continued The Investigation Resulting Into

20.

charges And Convictions lodged Against The Plaintiff Violates Plaintiff's Substantive And Procedural Due Process Rights Under The 14th Amend. U.S.C. Plaintiff Now Suffers From Post Traumatic Stress Disorder (PTSD)

## Second Cause of Action

Defendants Knowing Use of A Known False And Fabricated Evidences As Basis For Their Investigation Against Plaintiff Resulting Into The charges And Convictions Against Plaintiff Violate Plaintiff's 14th Amendment Right. Plaintiff Is Innocent of Defendants Investigation. Plaintiff Now Suffers From PTSD.

## Third Cause of Action

Defendants' Known Use of A Known False Evidences As Basis For Their Alleged Investigation Resulting Into charges And Convictions As A Direct Result of Defendants False And Fabricated Evidences Known To Defendants At The Time of Their Investigation, Was Cruel And Unusual Punishment Violating Plaintiff's 8th Amendment Right of The United States Constitution. Plaintiff Now Suffers From PTSD. Plaintiff Is Innocent of Defendants' Investigation.

## Fourth Cause of Action

Defendants' Known Use of A Known False Evidences As Basis For Their Alleged Investigation Resulting Into charges And Convictions As A Direct Result of Defendants False And Fabricated Evidences Known To Defendants At The Time of their Investigation, Ultimately Sending Plaintiff To Prison And Puting Plaintiff In Harms Way. Where Plaintiff Was Stabbed Multiple Times And Flown To UMC Where Plaintiff Was Subjected To Life Support For 3-4 days, Without Provocation. Was Cruel

-21-

And Unusual Punishment Violating Plaintiff's 8th Amendment Right of The United States Constitution. Plaintiff Now Suffers From PTSD. Plaintiff Is Innocent of Defendants' Investigation.

<u>Fifth Cause of Action</u>

Defendants (Prison) official Jane Doe And John Doe Failure To Protect Plaintiff From Harm, In light of Plaintiff's Plead To Defendants Just Days Before Plaintiff Was Beating Up And Stabbed By Known Gang Members. Defendants Were Deliberately Indifference To The Plaintiff After Plaintiff Sought Help To Protect His Life. Defendants Actions was Cruel And Unusual Punishment Violating Plaintiff's 8th Amendment Right of The United States Constitution. Plaintiff Now Suffers From PTSD. Plaintiff Is Innocent of Defendant's Investigation.

<u>Sixth Cause of Action</u>

Defendants' Known Use of A Known False Evidences As Basis For Their Alleged Investigation Resulting Into charges And Convictions As A Direct Result of Defendants False And Fabricated Evidences Known To Defendants At The Time of Their Investigation, Ultimately Sending Plaintiff To Prison. Where Plaintiff Was Placed In Solitary Confinement For Seven (7) years straight At One Point of His Incarceration, Violates Plaintiff's 8th Amendment Right of The United States. Because Had Defendants Not Used A Known False And Fabricated Evidences As Basis For Their Investigation Resulting Into charges And Convictions And Incarceration, Plaintiff Would Not Have Been Subjected To The Seven (7) Year Solitary Confinement. Plaintiff Now Suffers From PTSD. Plaintiff Is Innocent of Defendants' Investigation.

## Seventh Cause of Action

Plaintiff Has Suffered Physical Injuries As A Direct Result Of Defendants' Unlawful Actions Since. Plaintiff Has Since Developed High Blood Pressure And Now On medication For The Condition Since 2010 And Current. Plaintiff Was stabbed multiple Times And still Deals with The Flash Backs. Plaintiff Is On Amlodipin 10 mg Tablets Daily For His High Blood Pressure. And The Most Recent Diagnosis, Plaintiff Now Suffers From PTSD, And On Medications For This Condition As well. All of These Injuries Are A Direct Results of Defendants' Unlawful Actions From Their Investigation That Was Based On A Known False And Fabricated Evidences. It Violates Plaintiff's 8th Amendment United States Constitution Right.

## Eighth Cause of Action

Plaintiff Also Now Suffers From Mental Distress And Anguish Due To All of These Experiences. That Was Based On Defendants' Unlawful Actions Taken Against Plaintiff In Their Investigation. Using A Known False And Fabricated Evidences Against Plaintiff In Their Alleged Investigation. It Violates Plaintiff's 8th Amendment Right.

/ / /

/ / /

All Causes of Action stated In This Complaint Are All Based On Continuing And Ongoing Violation, As The Unlawful Actions of Defendants As Stated In This Complaint Are Continuing At This Time. Although Plaintiff Was Recently Released From Prison, He Is still On Parole Currently And Habeas Is No longer Available. As Such, This Remedy Is The Correct Remedy And Vehicle At This Time. Nenette V. small, 316 F. 3d 872, 875-76 (9th Cir. 2002). Plaintiff seeks To Recover

-23-

Damages In The Full Capacity of All His Injuries Sustained. Plaintiff Also Seeks To Recover Punitive Damages Against All Named Defendants For Their Unlawful Actions Taken Against Plaintiff Under The Color of Law.

///

///

   If A Violation of Right Takes Place Over A Period of Time It May Be Considered To Be A "Continuing" (or Continuing Harm, Violation, etc). That means The Statute of Limitations may Not start To Run Until The End of That Period, And A Plaintiff may Recover Damages For The whole Course of Conduct Even If It started outside The limitations Period. Flower V. Carville, 310 F.3d 1118, 1126 (9th Cir. 2002); Knox V. Davis, 260 F.3d 1009, 1014 (9th Cir. 2001); Heard V. Sheahan, 253 F.3d 316, 320 (7th Cir. 2001) (Adopting Continuing Wrong Rule For §1983 Suit) And Cases Cited Accord, Shamro V. City of New York, 579 F.3d 176, 181 (2nd Cir. 2009) (Following Heard V. Sheahan, Supra); Hensely V. City of Columbus, 557 F.3d 693, 697 (6th Cir. 2009) (" "Continuous Violation" Exists If (1) The Defendants Engage In Continuing Wrongful Conduct; (2) Injury To The Plaintiffs Accrues Continuously; And (3) Had The Defendants At Any Time Ceased Their Wrongful Conduct, Further Injury Would Have Been Avoided"); Tiberi V. Cigna Corp., 89 F.3d 14 23, 1430-41 (10th Cir. 1996) (Applying New Mexico Law And Holding Claim Accrues, And Limitations Period Runs, From Date of Last Injury Or When "The Wrong Is Over And Done with").

   In This Instant Complaint, Plaintiff's Right Were Repeatedly Violated Each Day Plaintiff Was Incarcerated Resulting From Defendants Investigation That Was Based On The Use of A Known False And Fabricated Evidences. The Violation And Injuries Began On 10/27/1997

-24-

And Currently Continuing Because Plaintiff Is still Currently On Parole.
 See Also, <u>Devereaux V. Abbey</u>, 263 F.3d 1070, 1074-75 (9th Cir.
2001); <u>Miller V. Pate</u>, 386 U.S. 1, 7 (1967). For when False Evidences
Is Deliberately Used.


## <u>RELIEF SOUGHT</u>

Wherefore, Plaintiff Prays For The Following Relief:
1. Damages In The Amount of $100,000,000 For All Named
Defendants Combined, Jointly And Severally, Individual Capacities,
By Jury For Injuries Sustained As Described In This Action;

2. Full Compensation As Established By The United States Supreme
Court In Several other Cases Where False Evidence Was
Deliberately Used And Its          Effects;

3. Plaintiff Seeks A Permanent Injunction official Capacity Completely
Expunging The Investigation And Its Resulting Effects From
Plaintiff's Record;

4. Punitive Damages, By Jury;

5. Declaratory Judgment;

6. Any And All other Relief Deemed Appropriate And Proper By
This Court;

7. The Cost of This Action And All legal Fees And Expenses;

8. Jury Demand, Rule 38

-25-

## VERIFICATION

I, Swear That I Am The Plaintiff In This Case And That I Have Read The Content Herein, And Same Is True And Correct To The Best Of My Knowledge And Belief. Under Penalty Of Perjury, Pursuant To NRS 208.165 of The Nevada Revised Statute, I Hereby Verify That The Foregoing Is True, Correct And of my own Knowledge.

DATED: October 12, 2022

Enoma Igbinovia
ENOMA IGBINOVIA
Plaintiff

## INDEX OF EXHIBIT

| EXHIBIT | DATE | DESCRIPTION |
|---|---|---|
| 01 | 10/23/1997 | Arrest Report Taken From the Night of The Alleged Incident. |
| 02 | 02/26/1998 | Motion In limine Filed suppressing All Defense Favorable Evidences, And stopping Defense From Asking Alleged Victim About Marijuana Purchase Plaintiff Went There for |

| EXHIBIT | DATE | DESCRIPTION |
|---------|------|-------------|
| 03 | 04/24/2003 | Motion Codefendant Filed During His Evidentiary Hearing Requesting The Production of The Only Basis For Defendants' Alleged Investigation Resulting Into charges And Convictions. This Motion Was Granted Which Forced Defendants To Release Plaintiff's Codefendant In 2005. |
| 04 | 03/04/2004 | Stipulation And Order To Continue Evidentiary Hearing. After Defendants Were Unable To Produce The Only Evidences That Was The Basis Of Defendants' Alleged Investigation Resulting Into charges And Convictions of Plaintiff And His Codefendant. Which Defendants claimed They Had During Their Investigation. Exhibit-03 Above Was Granted. |

| EXHIBIT | DATE | DESCRIPTION |
|---|---|---|
| 05 | 08/09/2005 | Plaintiff' Petition Filed By His Private Counsel Who Investigated The Case Further And Filed The Petition For Plaintiff To Get The Law Of The Case Applied To Him After His Codefendant was Released. |
| 06 | | This Is The Denial Of The Petition Plaintiff's Counsel Filed Attached Herein As Exhibit-05. |
| 07 | 09/22/2022 | This Is Plaintiff's Mental Health Evaluation And Diagnosis And Prescribed Medicine To Help Him Cope And Deal With The Extensive Traumatic Experiences He Had To Endure For Many Many Years. |

-28-

| EXHIBIT | DATE | DESCRIPTION |
|---|---|---|
| 08 | | This Is Plaintiff's Medical Records From UMC In Las Vegas Where And When He Received Treatment After He Was Stabbed Multiple Times Including once In The Neck. |
| 09 | | These Are Copies of Subpoenas Filed By Plaintiff's Codefendant Attorney Requesting The Gun Records Defendants claimed we Robbed The Alleged Victim For. This Subpoenas And Many Other More Were Filed For The Production of The Records Requested As Exhibit-03, which Was The Basis of Defendants' Investigation. Rather Than Produce And Because They Could Not Produce Evidences That Never Existed, Both Partie File Exhibit-04. |

EXHIBIT — 01

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**ARREST REPORT**

| | City | | County | | X | Adult | | | Juvenile | | Sector/Beat | V4 |

| ID EVENT # | ARRESTEE'S NAME | (Last, First, Middle) | | S.S.# |
| | HARVEY, CECIL Anoy | | | |

ARRESTEE'S ADDRESS (Number, Street, City, State, Zip Code)

CHARGES: ROBBERY USING DEADLY WEAPON IN COMMISSION OF CRIME NRS 200.380 KIDNAP USING DEADLY WEAPON IN COMMISSION OF A CRIME NRS 200.310 EX-FELON IN POSSESSION OF FIREARM NRS 202.360 EX-FELON FAILURE TO REGISTER NRS 207.090

| OCCURRED | DATE | DAY OF WEEK | TIME | LOCATION OF ARREST (Number, Street, City, State, Zip Code) |
| | 102897 | | | |

| RACE | SEX | D.O.B. | HT | WT | HAIR | EYES | PLACE OF BIRTH |

**CIRCUMSTANCES OF ARREST**

Note:       This is a continuation of an Arrest Report dictated on 102897 under this same event number.

On 102897 at approx. 2025 hours, Officer M. Chapman, P/N 4039, and I, Officer D. Sacra, P/N 5481, operating as unit 3D5, were dispatched to 6500 W. Charleston, Apt. #339, Las Vegas, NV 89102, in reference to a ROBBERY call. Upon arrival, I made contact with the victim, Joe __ Villanueva, DOB 020777, SSN 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. Villanueva stated to me that at approx. 2010 hours on this date, two unknown BMA's knocked on his apartment. Villanueva stated he opened the door and the two BMA's forced their way into the apartment.

Once inside the apartment, both subjects put small caliber hand guns in Villanueva's face and said, "Give me the fucking guns, give me the SKS's, and shot guns." One of the subjects asked Villanueva who else was in the house and when he learned that Villanueva's girlfriend was there, Sabrina M. Johnson, DOB 012980, SSN 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, the subject had Johnson go to the bedroom and stay there. The subject who told Johnson to go to the bedroom and to stay there is identified as Harvey, Cecil and he also goes by the street names of "Smokey", "C", and "C-Bone". Accordingly to Villanueva, Harvey or "Smokey" had Johnson go to the bedroom and stay there. Villanueva said that the other subject, later identified as Igbinova, Enoma Uyg, who also goes by the street names of "Looney" or "Norman", had Villanueva go to his room to retrieve the weapons. Villanueva stated to us that during this time Igbinova, or "Looney", had a blue .38 Special pointed at him. Igbinova had Villanueva go to the main bedroom closet to retrieve the weapons. Once Igbinova got the weapons from the main bedroom closet, he pulled the trigger of the blue .38 Special, accordingly to Villanueva. Villanueva told us that the hammer fell on an empty chamber. Villanueva said that once he realized that the weapon fell on an empty chamber, he also noticed that the gun had no ammunition because he could see through the cylinders. Villanueva stated he then ran for the door.

| ARRESTING OFFICER(S) | P/N | APPROVED BY | CONNECTING RPTS (Type of Event Number) |
| D. SACRA | 5481 | | DOB DOA ARREST REPORT / VOLUNTARY |
| M. CHAPMAN | 4039 | | STATEMENT 971023-1812 |

**APP. 133**

LAS VEGAS METROPOLITAN POLICE DEPARTME

## CONTINUATION REPORT

ID/Event Number:        1068011

A fight ensued between Villanueva and Igbinovia with Harvey joining in. Villanueva said that Igbinovia hit him on the left side of his face with the 38 Special pistol, causing a one inch gash. Villanueva stated that the subjects then fled to the parking lot with the weapons.

Villanueva said that he then went to his room and grabbed a sword and ran in the direction that the suspects ran. He noticed both suspects getting into a car which belonged to a friend of his. Villanueva said he recognized the car as belonging to his friend, Leslie Long. Villanueva said that he saw Leslie Long sitting in the driver's seat, hunched down, and he recognized him. Villanueva stated that he and Long were friends and they used to go skeet shooting together as well as attending culinary school together. Villanueva provided us with information with regard to Long's employment, the Appleby's located on Rainbow.

Officer R. Berni, PN 1488, arrived at the scene and assisted Officers, accordingly. Officer Berni made contact with the manager at Appleby's to confirm Leslie Long's employment there. Officer Berni then learned that Leslie Long was scheduled to work again on Tuesday, 102897. During Officer Berni's regular days off, he was contacted by Leslie Long regarding the ROBBERY/KIDNAPING. Officer Berni advised Long to be at the NEAC substation at 1530 hours on 102897. Long provided Officers with a tape recorded interview which was given voluntarily. Before Officer Berni began the tape-recorded interview, he advised Leslie Long of his rights as per the Miranda decision. Leslie Long stated that he understood his Miranda rights and that he was giving the interview voluntarily.

Leslie Long stated, during the tape recorded interview, that the suspect known as "Looney" goes by the first name of Norman. He is a BMA approx. 6'1" tall, weighing approx. 180 pounds, and speaks with an accent believed to be Nigerian. He is 23 to 25 years of age. Long stated that "Looney" is currently under house arrest by the County. The suspect known as "Smokey", as described by Long in the tape-recorded interview, also goes by the other street name of "C". "Smokey", or "C", is a BMA, 25 to 26 years of age, 5'9" tall, weighing about 170 pounds, and who resides with "Looney" or Norman. Long stated that on 102397, he was called by Looney to go purchase some marijuana. Long told "Looney" or Norman that he did not have any gas to bring him to go purchase some marijuana, but when "Looney" said he would give him some gas money, Long decided he would take him. Long said that he picked up "Looney" and "Smokey" from their apartment at 4885 S. Torrey Pines, #102, Las Vegas, NV 89103, and drove them to 6500 W. Charleston, Apt. #338.

Long stated that he was merely in the car in the parking lot when he noticed "Looney" and "Smokey" running out of the apartment. During the interview, Long also stated he saw "Smokey", also known as "C", running with the weapons. Long stated that when he saw "Smokey" and "Looney" running towards the car, he started it up and put it in drive as if to leave. He then stated that he stopped when "Looney" and

**APP. 134**
LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**CONTINUATION REPORT**

)/Event Number:       **1068011**                                                                    Page 3 of 6

"Smokey" were getting into the car.  Long also said that during the time when "Smokey" was entering the car, he was throwing the weapons in the back.  The twelve gauge shotgun in question, during the ROBBERY, fell out of the car and onto the ground, as stated by Long.

It should be noted that during Officers interview with the victim, Joe Villanueva, Villanueva stated to Officers that the shotgun was, indeed, stolen.

As stated before, Long was read his rights as per Miranda and he understood his rights by acknowledging verbally, "Yes".  Long was also read his rights per Miranda on audio tape before any questioning and he stated he understood his rights.  Long also understood by his voluntary interview that no special treatment would be given and that it was up to the District Attorney.  During the taped interview, Long told Officers that when "Smokey" and "Looney" got into the car, they left the parking lot.  Long than asked both of them what had happened and they replied that Villanueva had tried to "smoke" them.  Long was told by "Looney" and "Smokey" that when they had gone up to the apartment to purchase marijuana, "Looney" was not satisfied with the purchase.  When "Looney" knocked on the door to talk to Villanueva about the purchase of marijuana, as well as asking him for his money back, Long was told that Villanueva was the one who, indeed, had the pistol in "Looney" or Igbinovia's face.  Long said that when Igbinovia or "Looney" noticed the pistol unloaded in Villanueva's hand, that's when the fight ensued and "Smokey" or Harvey took the weapons.  Long stated that when he saw "Looney" and "Smokey" running towards the parking lot with the weapons, he decided to start the engine and proceed to drive off.  Then Long told Officers that he stopped to pick up "Looney" and "Smokey" with the weapons.  That's when "Smokey" dropped the twelve gauge shotgun in question.  Once inside the vehicle, all three proceeded to exit the parking lot onto Charleston.

Long stated he saw Villanueva running in the parking lot with a long, silver object, coming after them.  Long said he did not know if the long, silver object was a sword or a silver type weapon, when he was driving off.  After the interview with Officers Berni, Chaparian, and I, Officer Sacra, Leslie Long was placed under arrest for CONSPIRACY TO COMMIT ROBBERY, NRS 200.380 and transported to CCDC and booked accordingly.

Once Long was booked into the CCDC, Officers Berni, Chaparian, and I, Officer Sacra, proceeded to 4887 Tropicana/Torrey Pines.  This was the original address which Long gave to Officers during the tape recorded interview.  Officers Berni, Chaparian, and I, as well as Officers from the SWAC and SWAC PSU, attempted to locate the address of 4887 Tropicana/Torrey Pines, Apt. 120.  The SWAC PSU unit sent a two man reconnaissance team in plain clothes and unmarked vehicles to the vicinity of 4887 Tropicana but could not find the address.  At that time, Officer Berni, Officer Chaparian, and I, Officer Sacra, proceeded back to the CCDC to pick up Leslie Long on a release.

**APP. 135**
**LAS VEGAS METROPOLITAN POLICE DEPARTME**
## CONTINUATION REPORT

Once Leslie Long was released to the custody of Officer Berni, Leslie Long and Officer
Berni proceeded back to the vicinity of Tropicana and Torrey Pines, with Officer
Chaparian and me, Officer Sacra, following. Upon arrival, the Police Officers from the
SWAC and the SWAC PSU met up and the two man reconnaissance team in plain
clothing and the unmarked vehicle, with Officer Berni, took Leslie Long to the area
where Igbinovia lived. Long gave Officers a positive identification of the address
where Igbinovia lived, 4885 S. Torrey Pines, Apt. 102, Las Vegas, NV 89103.

After Leslie Long had positively identified the address, he was left with an Officer at
the rallying point, and Officer Berni, Officer Chaparian, and I, Officer Sacra, as well as
Officers from the SWAC and the SWAC PSU, proceeded to 4885 S. Torrey Pines, Apt.
102, in an attempt to make contact with Igbinovia. Upon arrival at that apartment,
we knocked on the door numerous times, trying to get Igbinovia to answer. After
about five minutes of knocking on the door, Igbinovia was attempted to be reached via
telephone by a SWAC Sergeant. Officers were outside of the door, still knocking, and
could hear the telephone ringing.

Officers let the phone ring about 15 to 20 times, hoping Igbinovia would answer the
phone, to be in compliance with his house arrest orders. Upon not answering the
phone, Officers departed the area and returned to their rallying point, at Tropicana and
Torrey Pines. Officer Berni then proceeded to take Leslie Long back to CCDC and
rebook him.

Before Officer Berni returned to CCDC for the rebooking, liaison was made between
Officer Berni and the SWAC Sergeant and Police Officers to try again 102997. During
Officer Berni's off time, he made contact with NV State Parole and Probation Officer,
David Devel, regarding Igbinovia. It was learned that Igbinovia was, indeed, under
house arrest and positive date of birth, social security number, and ID numbers were
provided to Officer Berni as well as verification of the correct address and phone
number.

On 102997 at approx. 1545 hours, Officer Chaparian, Officer Berni, and I, Officer
Sacra, proceeded to the rallying point of Torrey Pines and Tropicana. At 1600 hours,
we met with NV State Parole and Probation Officer, David Devel, as well as Officers
from the SWAC. At approx. 1615 hours, upon request of David Devel, to gain entry
into the apartment, after several knocks and announcement of "Police Officers",
Officer Chaparian and Officer Berni gained entry into the apartment by kicking in the
door. This was done at the request of David Devel, to gain entry into the apartment.

Once inside the apartment, Officers cleared the apartment and found the subject,
Igbinovia, hiding under his bed. Igbinovia was taken into custody and read his rights
as per the Miranda decision by Officer Berni. Igbinovia stated he understood his rights
as per Miranda by stating, "Yes". Immediately, Igbinovia stated to Officer Berni that

APP. 136

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**CONTINUATION REPORT**

ID/Event Number:        1068011                                                                    Page 5 of 6

he had nothing to do with the ROBBERY/KIDNAP and that it was just a big misunderstanding.

Igbinovia was questioned by numerous Officers regarding where the stolen weapons were. Igbinovia stated he did not know where the weapons were and that he did not have them. After a time frame of 15 to 20 minutes, Igbinovia stated to us that he would assist by calling Cecil Harvey, also known as "Smokey" or "C-Bone", and have him come over to pick him up. At 1700 hours, after placing numerous phone calls trying to reach Harvey, Igbinovia made contact with Harvey and told him to come over and pick him up.

At approx. 1730 hours, Harvey arrived at the apartment at 4885 S. Torrey Pines, #102, Las Vegas, NV, 89103, and rang the doorbell. Officer Chaparian opened the door with Officer Berni and I bringing Harvey into the apartment and doing a felony prone on him. Harvey was placed into handcuffs and his rights as per Miranda were read to him by Officer Berni and he stated he understood his rights by answering "Yes". A positive identification on Harvey was made by a NV driver's license: Harvey, Cecil, a BMA, DOB/060172, SSN/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, ID# 1068011. Harvey stated to us that he currently lives on and off with his mother at 537 Rancho Del Mar, N Las Vegas, NV 89031, (702) 642-5053.

Once Harvey and Igbinovia were in custody, ID was called to take photographs of the damage to the door. ID Tech Fletcher, PN 5221, responded at 1700 hours, and was placed on hold until both suspects were in custody, for her safety. At approx. 1730 hours, Fletcher entered the apartment and took photographs of the damaged door. Before leaving the apartment, we asked Igbinovia how he wanted to secure the apartment. Igbinovia said he wanted his sister to come over and take care of it and at that time, we contacted his sister, and she said she would take care of the securing of his apartment.

We then left the apartment complex with Officer Chaparian and I transporting Harvey and Officer Berni transporting Igbinovia. We were going to proceed to 537 Rancho Del Mar, N. Las Vegas, to contact Harvey's mother. Out intention at 537 Rancho Del Mar was to do a knock and talk with Harvey's mother and to get a consent to search form signed by her to look on the premises for the missing weapons. While en route to that address, Officer Berni learned from Igbinovia the phone number of Cecil Harvey's wife. Officer Berni did a criss-cross on the phone number which provided the address of 324 Dockside in the beat/zone of V4. We then went to that address, instead of the Rancho Del Mar address, to talk to Cecil Harvey's wife, Daniella Harvey. Officer Berni and Officer Chaparian did a knock and talk with Daniella Harvey and were given consent to enter the house and look for the stolen weapons.

It should be noted that Daniella Harvey's parents were also home at the time and gave their consent to us to search anywhere Officers wanted to look.

**APP. 137**

**LAS VEGAS METROPOLITAN POLICE DEPARTM**
## CONTINUATION REPORT

D/Event Number:      1068011                                                         Page 6 of 6

Officer Berni and Officer Chaparian did not find any weapons at the residence on Dockside.  Upon exiting this house, Daniella Harvey's father gave Officers the keys to a van which was parked directly in front of the residence.  Officers then unlocked the van and searched it for the weapons, with the permission of Daniella Harvey and her father.   Once the verbal consent to search the van had been given, Officers then searched it and found no weapons.  The Officers then transported Cecil Harvey and Enoma Igbinovia to CCDC.

Once at CCDC, Harvey and Igbinovia were booked for their charges as noted above. It should also be noted that Igbinovia had a detainer placed on him at CCDC for three traffic WARRANTS out of the City.

DS/mm (03)
JOB# 22438
DICT: 103097/0014 HRS
TRANS: 103097/0200 HRS

cc:    Officer D. Sacra, PN 5431/NWAC31
       Officer M. Chaparian, PN 4039/NWAC31
       Officer R. Berni, PN 1488/NWAC31

EXHIBIT - 02

ORIGINAL

F... 6   3 52 PM '98

CLERK

1    **0071**
     STEWART L. BELL
2    DISTRICT ATTORNEY
     Nevada Bar #000477
3    200 S. Third Street
     Las Vegas, Nevada 89155
4    (702) 455-4711
     Attorney for Plaintiff
5

6                     DISTRICT COURT
                CLARK COUNTY, NEVADA
7

8    THE STATE OF NEVADA,

9                Plaintiff,

10     -vs-                                    Case No.   C146894
11   CECIL LAROY HARVEY, III., #1068011,       Dept. No.  XIV
     ENOMA UYG IGBINOVIA, #1191445             Docket     T
12

13                Defendant.

14   _____

15              NOTICE OF MOTION AND MOTION IN LIMINE

16                   DATE OF HEARING:  03/02/98

17                   TIME OF HEARING:  9:00 A.M.

18         COMES NOW, the State of Nevada, by STEWART L. BELL, District Attorney, through

19   WILLIAM HEHN, Deputy District Attorney, and files this Notice of Motion and Motion in

20   Limine.

21         This Motion is made and based upon all the papers and pleadings on file herein, the

22   attached points and authorities in support hereof, and oral argument at the time of hearing, if

23   deemed necessary by this Honorable Court.

24   //

25   //

26   //

27   //

28   //

                                              CE42

## NOTICE OF HEARING

YOU, AND EACH OF YOU, WILL PLEASE TAKE NOTICE that the undersigned will bring the foregoing motion on for setting before the above entitled Court, in Department XIV thereof, on Monday, the 2nd day of March, 1998, at the hour of 9:00 o'clock a.m., or as soon thereafter as counsel may be heard.

DATED this 26th day of February, 1998.

STEWART L. BELL
DISTRICT ATTORNEY
Nevada Bar #000477

BY _William Hehn_
WILLIAM HEHN
Deputy District Attorney
Nevada Bar #001538

## POINTS AND AUTHORITIES

## FACTS

On October 23, 1997, at approximately 8:00 P.M., JOEL VILLANUEVA and his girl-friend, SABRINA JOHNSON, were at Mr. VILLANUEVA'S apartment located at 6500 West Charleston, Las Vegas, Nevada. While watching television in the bedroom, both heard a knock at the door. Mr. VILLANUEVA went to answer the door and was met by the Defendants who forced their way into the residence. The Defendants were armed and demanded that Mr. VILLANUEVA give them his money and his guns. They forced SABRINA JOHNSON into another bedroom and held her at bay while taking the property.

The Defendants then took 2 shot guns and an AKA semi-automatic rifle from Mr. VILLANUEVA. During this process, Defendant Harvey keeping Ms. JOHNSON in the bedroom and Defendant IGBINOVIA pointing a gun at Mr. VILLANUEVA, the pointed gun was cocked and at a time, the trigger was pulled wherein Mr. VILLANUEVA discovered that the gun was either empty or had misfired. The Defendants then got into another struggle with Mr. VILLANUEVA whereupon Mr. VILLANUEVA was struck in the head with the pistol and the

-2-

P:\WPDOCS\MOTION\715\71573101.WPD

1   Defendants escaped with the firearms of Mr. VILLANUEVA.

2       Mr. VILLANUEVA chased the Defendants out to the parking area where he saw them

3   get into a vehicle being driven by a person whom he recognized as a prior acquaintance. This

4   person ultimately led the police to the Defendants. However, the firearms were never recovered.

5

6   DISCUSSION

7       During the preliminary hearing, the Defense asked Mr. VILLANUEVA on three different

8   occasions if he sold marijuana and upon receiving a negative answer, they asked Ms. JOHNSON

9   on three different occasions about Mr. VILLANUEVA and his "dealing" in drugs.

10       The State requests this Court to prohibit such conduct by the Defense during the trial in

11   this matter. The evidence is not relevant. NRS 48.015, in pertinent part, defines relevant

12   evidence as "any evidence having any tendency to make the existence of any fact that is of

13   consequence to the determination of the action more or less probable than it would be without

14   the evidence".

15       Even if the Court should find the evidence relevant, NRS 48.035 allows exclusion of

16   relevant evidence if "its probative value is substantially outweighed by the danger of unfair

17   prejudice, of confusion of the issues or of misleading the jury". Whether the witness ever sold

18   controlled substances and therefore should be robbed is of no relevance.

19       Secondly, clearly the asking of Ms. JOHNSON is inappropriate as the question is

20   collateral. NRS 50.085 and the collateral evidence rule make the extrinsic evidence inadmissible.

21   See, Efrain v. State, 107 Nev. 947 (1991), wherein the Nevada Supreme Court held:

22           Moreover, the admission of specific instances of a witness'
        conduct, other than criminal convictions, may not be proved by

23           extrinsic evidence.

24   //

25   //

26   //

27   //

28   //

-3-

CONCLUSION

It is apparent that the Defense purpose in asking such questions is to smear the victim and seek jury approval of the illegal behavior of the Defendants. Therefore, it should be ordered that they not be allowed to ask these questions.

DATED this 26th day of February, 1998.

STEWART L. BELL
DISTRICT ATTORNEY
Nevada Bar #000477

BY _William Hehn_
WILLIAM HEHN
Deputy District Attorney
Nevada Bar #001538

RECEIPT OF COPY

RECEIPT OF COPY of the above and foregoing Notice of Motion and Motion in Limine is hereby acknowledged this 26 day of February, 1998.

PUBLIC DEFENDER
ATTORNEY FOR DEFENDANT HARVEY

BY _Shannon Johnson_
309 S. Third Street, #226
Las Vegas, Nevada 89101

RECEIPT OF COPY

RECEIPT OF COPY of the above and foregoing Notice of Motion and Motion in Limine is hereby acknowledged this 26 day of February, 1998.

JOHN L. DUFFY, ESQ.
ATTORNEY FOR DEFENDANT IGBINOVIA

BY _John L. Duffy_
723 S. Seventh St.
Las Vegas, Nevada 89101

tgd

JUL 11 2022

CERTIFIED COPY
DOCUMENT ATTACHED IS A
TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE

CLERK OF THE COURT

-4-

P:\WPDOCS\MOTION\715\71573101.WPD

EXHIBIT- 03

ORIGINAL

FILED

Apr 24   3 54 PM '03

*Shirley G. Parraguirre*
CLERK

MOT
GRAVES & LEAVITT
JOHN J. GRAVES, JR. ESQ.
NEVADA BAR NO. 001698
601 S. SIXTH STREET
LAS VEGAS, NEVADA  89101
(702) 385-7277
ATTORNEY FOR DEFENDANT
CECIL HARVEY

DISTRICT COURT

CLARK COUNTY, NEVADA

THE  STATE OF NEVADA,          )          Case No. C146894
                               )          Dept No.  V
               Plaintiff,      )
                               )
vs.                            )
                               )
CECIL HARVEY,                  )
                               )
               Defendant.      )
_____)

**MOTION FOR ORDER REQUIRING PRODUCTION OF RECORDS OF
FIREARMS REGISTRATION FOR JOSE VILLANUEVA**
* * *
**MOTION FOR ORDER GRANTING CONTINUANCE OF EVIDENTIARY
HEARING OF MAY 16, 2003**

COMES NOW, Defendant Cecil Harvey, by and through counsel, John J. Graves, Jr., Esq., and moves this Court for its Order granting the above-referenced Motions.  These Motions are made and based upon the papers and pleadings on file herein, the legal memorandum filed herewith, and any oral argument of counsel adduced at the hearing of the within matter.

DATED this 24th day of April, 2003.

GRAVES & LEAVITT

BY _____
JOHN J. GRAVES, JR., ESQ.
601 SOUTH SIXTH STREET
LAS VEGAS, NEVADA 89101
ATTORNEY FOR DEFENDANT
CECIL HARVEY

COUNTY CLERK

RECEIVED

APR 2 4 2003

## NOTICE OF MOTION

TO:   William Hehn, Deputy District Attorney.

PLEASE TAKE NOTICE that the undersigned will bring the foregoing Motions before the District Court, 200 S. Third Street, on the ___6___ day of May, 2003, at the hour of ___9___ A.M., in Department 5 or as soon thereafter as counsel may be heard.

DATED this 24ᵗʰ day of April, 2003.

GRAVES & LEAVITT

JOHN J. GRAVES, JR., ESQ.
601 SOUTH SIXTH STREET
LAS VEGAS, NEVADA  89101
ATTORNEY FOR DEFENDANT
CECIL HARVEY

### Legal Memorandum

I

### Continuance

This case is on remand from the Supreme Court of Nevada for an Ordered evidentiary hearing.  That hearing has been set for May 16, 2003.  A continuance is needed for the reason that certain witnesses need to be interviewed before hearing, to wit, Leslie Long, Jose Villanueva, Villanueva's mother, and Villanueva's girlfriend, Sabrina.  Villanueva is the alleged victim in the case who, according to his testimony, had rifles stolen from him the night of the purported burglary and robbery.  As well, Villanueva's mother, name unknown, needs to be contacted by defense counsel's investigator to determine whether she sold or gave any weapons whatsoever to Villanueva.  Leslie Long is on probation and needs to be located and interviewed regarding his conversations with Defendant's former defense attorney, Craig Jorgenson.  Villanueva's girlfriend was a percipient witness who was present in the apartment that night.  She and Villanueva probably no longer are an item, as it is believed that Villanueva was in prison at Indian Springs, and is now on parole.  As well, federal records need to be reviewed to determine any and all firearms owned

2

by alleged victim Jose Villanueva.  This may take a few weeks.

As the Court will recall, two (2) men (one of whom was Defendant Harvey) came to the door, according to apartment owner Villanueva, broke in to steal weapons.  Harvey testified that they came to buy drugs, and the deal went sour. Harvey testified that no rifles or other weapons were taken.

A continuance is needed to explore these avenues.  Defendant Harvey is sentenced to about 50 years in prison, so early release is not a factor.

The State of Nevada has no objection to the continuance.  Cf., EDCR 7.30. A continuance of 90 days from May 16, 2003 would be adequate.  The investigation has begun, jail records have been subpoenaed and received, Exhibit "A," hereof, and former defense counsel is under subpoena.

## II

### Production of Gun Registration Records from the
### Las Vegas Metropolitan Police Department

Counsel for Defendant Harvey subpoenaed records of gun registration from Metro, dated April 16, 2003.  See Exhibit "B," hereof.  The Clark County District Attorney's Office responded by letter stating that the records would not be produced. Exhibit "C," hereof.  See NRS 202.3662.

It is defense counsel's firm belief that gun registration records will show that Mr. Villanueva never registered any weapons whatsoever, making it less likely that any such weapons were actually present in his apartment on the night in question. The only four (4) percipient witnesses regarding weapons in the apartment are Sabrina and Villanueva, and the two (2) Defendants. The testimony is diametrically opposed.  Circumstantial evidence thus assumes a greater importance.

In **Roberts vs. State**, 110 Nev. 1121, 1134, 881 P.2d1 (1994), the Nevada Supreme Court held that it is the prosecutor's affirmative duty to present discovery required under **Brady vs. Maryland**, 373 U.S. 83, 83 S.Ct. 1194 (1963) for **in camera** review once particular evidence has been identified and a specific materiality

3

1   claim articulated, and that it does not matter whether Defendant formally requests the

2   **in camera** review. Although arguably the State of Nevada should have produced the

3   actual documents of Villanueva's ownership of the long guns, Defendant now

4   formally requests a Court Order to at least show diligence in checking Metro gun

5   registration records. "... As the Supreme Court has stated, once an accused states

6   a substantial basis for claiming materially, ' it is reasonably to require the prosecutor

7   to respond either by furnishing the information or by submitting the problem to the

8   trial judge,'" **Roberts**, 110 Nev. 1134.

9                                   **CONCLUSION**

10            For the above-ascribed reasons, Defendant Harvey moves this Court to

11   continue his evidentiary hearing to a date in late August, 2003. The State of Nevada

12   has no objection to a continuance. As well, this Court is requested to Order the

13   production of Las Vegas Metropolitan Police Department gun registration records of

14   alleged victim Jose Villanueva for review by counsel. Even though long guns can be

15   registered with Metro, but are not always so registered, such records are a relevant

16   inquiry of defense counsel. The State of Nevada should not have an objection to

17   such evidence.

18            DATED this 24th day of April, 2003.

19                                        GRAVES & LEAVITT

20                                   BY _John J. Graves, Jr._____
                                        JOHN J. GRAVES, JR., ESQ.
21                                       601 SOUTH SIXTH STREET
                                        LAS VEGAS, NEVADA 89101
22                                       ATTORNEY FOR DEFENDANT
                                        CECIL HARVEY
23

24

25

26

27

28

                                        4

## DISTRICT COURT

## CLARK COUNTY, NEVADA

THE  STATE OF NEVADA,

        Plaintiff,

vs.

CECIL HARVEY,

        Defendant.

Case No. C146894
Dept No.  XIV

**SUBPOENA DUCES TECUM
(CUSTODIAN OF RECORDS)**

TO:   Clark County Detention Center
330 S. Casino Center Blvd.
Las Vegas, Nevada 89101
Attention: Records (Pat)

YOU ARE HEREBY COMMANDED that all and singular, business and excuses set aside, you appear on the 15th day of April by 5:00 p.m. at:

PLACE:   Graves & Leavitt
601 S. Sixth Street
Las Vegas, NV 89101

You are required to bring with you at the time of your appearance any items set forth on the reverse side of this subpoena. If you fail to attend, you will be deemed guilty of contempt of Court and liable to pay all losses and damages caused by your failure to appear and in addition forfeit one hundred and no/100 ($100.00) dollars.

SHIRLEY B. PARRAGUIRRE, CLERK OF COURT

BY _____
DEPUTY CLERK

APR 1 0 2003
DATE

MANUEL RIVAS, DEPUTY

ISSUED AT THE REQUEST OF:

JOHN J. GRAVES, JR., ESQ.
GRAVES & LEAVITT
601 S. SIXTH STREET
LAS VEGAS, NV 89101
ATTORNEY FOR DEFENDANT
CECIL HARVEY

**RECEIPT OF COPY**

RECEIPT OF COPY of the MOTION FOR ORDER is hereby acknowledged

this _____ day of April, 2002.


CLARK COUNTY DISTRICT ATTORNEY
200 S. THIRD STREET
LAS VEGAS, NV 89101

5

EXHIBIT - 04

# ORIGINAL

**SAO**
GRAVES & LEAVITT
JOHN J. GRAVES, JR. ESQ.
NEVADA BAR NO. 001698
601 S. SIXTH STREET
LAS VEGAS, NEVADA  89101
(702) 385-7277
ATTORNEY FOR DEFENDANT
CECIL HARVEY

FILED

2004 JAN -7  A 10: 08

*Shirly B Paragim*
CLERK

## DISTRICT COURT

## CLARK COUNTY, NEVADA

THE  STATE OF NEVADA,

        Plaintiff,

vs.

CECIL HARVEY,

        Defendant.

Case No. C146894
Dept No.  V

## STIPULATION AND ORDER TO CONTINUE EVIDENTIARY HEARING

IT IS HEREBY STIPULATED by and between the parties hereto, that the evidentiary hearing in the above-captioned matter, currently set for January 23, 2004 at 9:00 a.m. be continued and rescheduled to a time convenient to the Court in March, 2004.  The continuance is necessary inasmuch as the parties are pursuing a possible resolution of the matter which would obviate an evidentiary hearing altogether.

DATED: January 2, 2004

DATED: January 4, 2004

JOHN J. GRAVES, JR., ESQ.
601 SOUTH SIXTH STREET
LAS VEGAS, NV 89101
ATTORNEY FOR DEFENDANT
CECIL HARVEY

WILLIAM A. HEHN, ESQ.
DEPUTY DISTRICT ATTORNEY
200 SOUTH THIRD STREET
LAS VEGAS, NV 89101

///

///

///

COUNTY CLERK
RECEIVED
JAN 0 7 2004

## ORDER

Upon the Stipulation of the parties, and GOOD CAUSE APPEARING;

IT IS SO ORDERED that the hearing scheduled for January 23, 2004 at 9:00 a.m. be reset to the ____ day of March, 2004.

DATED this ____ day of January, 2004.

_____
DISTRICT COURT JUDGE

SUBMITTED BY:

_____
JOHN J. GRAVES, JR., ESQ.
NEVADA BAR NO. 1698
601 SOUTH SIXTH STREET
LAS VEGAS, NEVADA 89101
ATTORNEY FOR DEFENDANT
CECIL HARVEY

2

EXHIBIT-05

APP. 101

1  SUPP
   C. CONRAD CLAUS, ESQ.
2  Nevada Bar No. 6601
   815 South Casino Center
3  Las Vegas, NV 89101
   (702)384-4927 Phone
4  (702)474-1320 Fax

5

6                        DISTRICT COURT

7                     CLARK COUNTY, NEVADA

8                          * * * * *

9  ENOMA UYG IGBINOVIA,

10          Petitioner,              Case No. C-146894-C
                                     Dept. No. 5
11  vs.

12  JAMES M. SCHORNIG, Warden, High   **SUPPLEMENT TO PETITION FOR
    Desert Correctional Center        WRIT OF HABEAS CORPUS (POST-
13                                     CONVICTION)**

           Respondent.
14

15      COMES NOW, ENOMA UYG IGBINOVIA, Petitioner, (hereinafter referred to as "Petitioner"

16  or "Mr. Igbinovia") by and through his attorney of record, C. CONRAD CLAUS, ESQ., and hereby files

17  this supplement to Petitioner's Petition for Writ of Habeas Corpus (Post-Conviction) before this

    Honorable Court pursuant to NRS 34.724 as follows:
18

19      1.      That the Petitioner is currently in High Desert Detention Facility, Clark County, Nevada,

20  and has his liberty restrained by virtue of his conviction in the above styled and numbered cause.

21      2.      That Petitioner is restrained by virtue of a judgment of conviction in the Eighth Judicial

22  District Court, County of Clark, on January 23, 1998, where he is serving a sentence of fourteen (14)

    years to life.
23

24      3.      That the confinement of Petitioner is unlawful for the following reasons:

25      a.      The Petitioner Is Factually Innocent; There Is Newly Discovered Evidence Such
                That with the Use of this Evidence a Different Result Would Have Been Probable
26              at Trial .

27              Mr. Igbinovia and Cecil Harvey were charged with Burglary While in Possession

28  of a Firearm; First Degree Kidnaping with Use of a Deadly Weapon, Conspiracy to Commit Robbery

    with Use of a Deadly Weapon, Coercion with Use of a Deadly Weapon, and Possession of a Firearm by

APP. 102

1   an Ex-felon, allegedly occurring October 23, 1997.  Mr. Igbinovia is factually innocent.  This alone

2   constitutes a fundamental miscarriage of justice such as to provide a waiver of any time bars.

3        There is newly discovered evidence that could not have been obtained through the exercise of

4   due diligence. On April 5, 2005, Mr. Igbinovia was informed by Michael Feaster that the alleged victim

5   in this case, Joe Villanueva, had told Feaster that he had not in fact been robbed by Mr. Igbinovia and

6   the codefendant Cecil Harvey. At Villanueva's request, contemporaneous with the instant case, Feaster

7   had taken guns from Villanueva, because Villanueva stated that there was "heat on him" and that he had

8   been visited at his house by police earlier the same week as the supposed crimes which form the basis

9   of Defendant's convictions.  Feaster stated that he had possession of the guns and that this possession

10  of the guns was prior to the incident complained of.  At that meeting he told Feaster that he had made

11  up a story about the defendant and another person getting "into it" about some "weed," that he had

12  concocted a story about a robbery, that it did not happen, and that he needed to keep the guns a little

13  longer. (See Statement of Bruce Feaster, attached hereto.)

14       This statement was not obtained until April 5, 2005, when a happenstance meeting in prison

15  between the Mr. Igbinovia and Mr. Feaster occurred, at which time Mr. Feaster related these facts to Mr.

16  Igbinovia.

17       In this case, there was no offer of proof of any gun registration or legitimate ownership, only the

18  words of Villanueva. Even during Harvey's writ process, no documentation was provided. Harvey

19  testified that they went to Villanueva's to buy some "weed," and upon being shorted by him, they went

20  back, and a fight ensued. The police were not immediately called. A witness, Leslie Long, who was

21  originally arrested for robbery, in lieu of being charged, apparently received favorable treatment, and

22  gave a statement, in which he said that a shotgun was dropped in the parking lot as the Harvey was

23  getting into the car, and that Villanueva, who was chasing them with what appeared to be a long weapon,

24  got as close to the car as counsel table is to the witness stand; however, Villanueva, who chased them

25  out of the parking lot, stated that he never said that never saw any such weapons on the ground. Both

26  stories cannot be right.  As close as Villanueva got to the car, if a gun was in fact dropped, Villanueva

27  would have seen it, and most certainly the police would have preserved it as evidence. Witness Long did

28  state that they were there to buy marijuana, consistent with Harvey, however.

1    The main witness, Villanueva, changed his story to the police, finally stating that one was stolen,
2    he falsely testified that a gun was a gift from his mother. He further falsely testified that one of the rifles
3    was legitimately purchased, testifying that he showed the receipt for the police, said receipt was never
4    preserved nor mentioned in any police reports. The police certainly would have preserved this evidence;
5    as nowhere is a receipt for the SKS purchase, one of the allegedly stolen weapons, mentioned in any of
6    the arrest reports, this fact clearly demonstrates that he committed perjury. The jury was left with the
7    false impression that his acquisitions of his guns were legitimate. In fact, he was involved in stolen
8    weapons. The state let this impression stand, knowing it was false, or otherwise acting with reckless
9    disregard for the truth of these representations made to the jury.

10    Thus, any testimony about a gun being dropped, with no statements that this gun was picked up
11   by  one who was close to the gun that was allegedly his gun, is ludicrous.  The police were not
12   immediately called. No guns were ever recovered, nor even seen by the police. The witness's credibility
13   was extremely material to this case. Had the jury been presented with the newly discovered evidence,
14   a different result would have been probable. See Hennie v. State, 114 Nev. 1285 (1998). He is entitled
15   to a new trial on this.

16    Further, there is adequate cause for the waiver of any time bar based upon the recent acquisition
17   of this evidence.  Since a motion for new trial would be untimely, a writ is the proper remedy, per Snow
18   v. Nevada, 105 Nev. 521 (1989).  There is a sufficient basis to show good cause to excuse the procedural
19   bars or to conclude that a fundamental miscarriage of justice would have occurred from the failure to
20   consider his claims for relief on the merits, per the rule announced in Pellegrini v. State, 117 Nev.
21   860  (2001).  By virtue of not having this evidence, his conviction was unlawful in that it was in
22   violation of his 6th Amendment Right to Effective Assistance of Counsel, his right to confront evidence,
23   as well as his 14th Amendment Right to Due Process of Law.  This evidence (Villanueva's statement
24   to Feaster that the robbery did not happen and that he had in fact held Villanueva's guns) would have
25   had a dramatic impact on the alleged victim's credibility, and therefore would be extremely material to
26   the defendant's case. Because of the paramount importance of the witness's credibility in convicting the
27   defendant, this critical impeachment evidence would have led to a different verdict. Therefore, an
28   evidentiary hearing is required to determine if the writs should be granted.

b.    Mr. Igbinovia Was Convicted with Perjured Testimony. Said Testimony Was Known by the State to Be Perjury.

If the prosecution uses perjured testimony which it knew or should have known was perjurious, a conviction obtained by such testimony is "fundamentally unfair" and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Jimenez v. State. 112 Nev. 610 (1996) During the trial, Villanueva testified that the alleged three guns were obtained through legitimate means, two were bought, and one was a gift from his mother. Known to the state was that he gave a statement to the police that one of the guns he claimed was stolen from him, was in fact a stolen gun.

This information would have been devastating to the credibility of the supposed victim. He furnished no documentation whatsoever concerning his acquisition of the guns, and that he had obtained it illegally and neither he nor the state mentioned his prior conflicting statement to police at trial. This evidence casts Villanueva is an entirely different light: he goes from being an innocent victim who lawfully obtained guns (stating that he did not have to register them because of their length), to a person who traffics in stolen weapons.

Assuredly, Mr. Igbinovia's trial counsel should have raised the issue of perjured testimony at trial. The failure to raise such points was deficient performance.  The state also had a duty to not knowingly obtain a conviction based upon perjured testimony.  The fact is that Mr. Igbinovia is not guilty of the charges of which he was convicted.

Villanueva's credibility was crucial to the case, and knowing that the alleged victim is involved in stolen guns (Long testified that he sells guns that he gets from "Mexicans from the other side of town." ROA appeal, March 5, P. L 18-21.), rather than being cloaked with a veil of legitimacy, knowing that he lied to the jury, would have had a substantial impact on the jury in deciding whether he was truthful about this robbery.

There was further false testimony known or which should have been known by the state to be perjury concerning the SKS firearm.  Villanueva stated that the SKS was purchased, that he had a receipt, and that he had shared the information on the receipt with the police. Yet, somehow the police returned the receipt to Villanueva during an ongoing investigation concerning this particular firearm.

1    There could not have been a receipt, as he testified. See <u>State v. Havas,</u> 95 Nev. 706; 601 P.2d

2 1197 (1979), holding that it was a violation of defendant's due process rights in his trial for forcible rape

3 for State to fail to preserve the pants and undergarments of the victim, even though the victim testified

4 that the clothing was not torn in any way during the rape. See also <u>Cook v. State,</u> 114 Nev. 120; 953 P.2d

5 712 (1998), where a defendant was entitled to have his conviction for sexual assault reversed where the

6 police had lost the evidence gathered at the scene, including photos, initial reports of his statement, and

7 the sweater of his former domestic partner. <u>Stubli v. Big D International Trucks,</u> 107 Nev. 309; 810 P.2d

8 785; (1991), where the trial court properly dismissed a truck driver's complaint for damages for alleged

9 defective design and inadequate repairs because such sanction was justified for the failure of the truck

10 driver and his agents to preserve relevant evidence. <u>Sparks v. State,</u> 104 Nev. 316; 759 P.2d 180 (1988),

11 where the state's mishandling of evidence, which resulted in the loss of material evidence, as well other

12 errors of the district court in excluding testimony, limiting expert testimony, and rejecting a plea bargain

13 agreement required reversal of the conviction. <u>Sanborn v. State,</u> 107 Nev. 399; 812 P.2d 1279 (1991),

14 where the Supreme Court reversed a conviction, on, among other things, the defendant was prejudiced

15 by the police officer's mishandling of the gun that resulted in the loss of evidence of blood and

16 fingerprints. Clearly, this receipt would have been preserved.

17    At trial, Villanueva told the jury that he simply did not have the receipt with him. The fact is,

18 there was no receipt whatsoever or it was destroyed and/or lost by the state. It flies in the face of

19 common sense that the police would not preserve this piece of evidence. Further, in preparation for the

20 evidentiary hearing for Harvey's writ, the state violently objected to the production of any registration

21 records by Villanueva. See attached. Any prosecutor would have know that if Villanueva had purchased

22 a gun from a licensed gun dealer, the dealer would have been required to register this gun in the name

23 of the purchaser. This testimony was perjury and clearly known or should have been known to be

24 perjury. The state allowed perjury, or statements made with reckless disregard for the truth to

25 contaminate the proceedings. At the preliminary hearing, Villanueva said that he bought the SKS from

26 American Gun Club, then in trial, it became American Gun supply. Again, no receipt was ever

27 mentioned in discovery.

28    Despite the fact that the state knew that Villanueva had acknowledged that at least one of the

1  guns, the 12 gauge was stolen, despite the fact that the state acknowledged that he sold guns for a living,
2  in his argument he emphasized that Villanueva was legitimate, that he could not sell stolen guns because
3  they would be hard to sell. Argument, p.6, ll. 1-8. This argument was made, full well knowing that
4  Villanueva was involved in stolen guns. He willfully misled the jury. An evidentiary hearing is required
5  to determine what the state knew when the state's key witness Villanueva sponsored and argued what
6  appears to be obvious perjury.

7       This is but more false testimony that again infected the proceedings. The state was well aware
8  that no receipt existed, and again, notwithstanding whether or not his defense counsel's failure to raise
9  this constituted deficient performance, the state was under a duty to set the record straight so that any
10  conviction in this case would not be the result of perjury. This is another instance where his represented
11  legitimate acquisition of alleged gravamen of the offense, the purported stolen guns stolen from him,
12  could not be consistently explained, nor legitimately documented. The jury would have had ample reason
13  to discount his testimony and believe the defense witnesses that no robbery happened. The state's
14  knowing use of false testimony and its willful failure to correct same amplifies the materiality of the
15  perjury. The state would not have wanted the jury to hear this. (Incidentally, Villanueva is in Federal
16  Custody serving a sentence for Felon in Possession of a Weapon, having been convicted of robbery in
17  1999. Additionally, in 2004 he was convicted of carrying a concealed weapon without a permit). The
18  actions of the prosecutor in allowing the perjury of a violent felon who involves himself with stolen guns
19  to stand constituted a fundamental miscarriage of justice, a denial his 14th Amendment rights to due
20  process.

21       A gun purchased at a retail store is required to be registered. The database is in the possession
22  of the state through its agencies. The state is thus charged with knowledge of whether there was a valid
23  registration, which would have occurred if Villanueva had a receipt. The state attorney is charged with
24  constructive knowledge and possession of evidence withheld by other state agents, such as law
25  enforcement officers. Jimenez v. State, 112 Nev. 610 (1996).   See, Kyles v. Whitley, 514 U.S. 419,
26  (1995), holding that the responsibility of the prosecutor remains regardless of any failure by the police
27  to bring favorable evidence to the prosecutor's attention. The state, thus is charged with knowledge of
28  whether there was a valid registration, they violently resisted this request, and instead surgically and

1   conditionally removed his consecutive enhanced sentence, via the  Nunc Pro Tunc Order, attached.

2   Therefore, there are more issues of constitutional magnitude that, just as in Harvey's case, a hearing is

3   required to establish whether the state knew his testimony was perjured, or alternatively whether the state

4   acted with reckless disregard for the truth in allowing it to stand. Likewise, with respect to Leslie Long,

5   he was arrested, and originally charged. It appears that he received favorable treatment. The prosecutor

6   stated to the court that Long was not a defendant because "he wasn't screaming enough. In his final

7   argument, he argued that the three of them planned the robbery, p.7, ll. 22-23, that Long had told them

8   about the guns they could get, p.7, ll. 2-7, and that Long was crouched down.p.6, Lines 14-20, and said

9   that they all conspired, p.15, ll. 10-20. He was not charged, and was subpoenaed by the state, Limine

10  hearing, p.11, ll. 2-4. As also stated in Jimenez, "[t]he prosecution's duty to disclose exculpatory or

11  impeachment evidence is not limited to situations where the state admits that it made a deal with an

12  informant. Where the credibility of a witness is an important issue in the case, evidence of any

13  understanding or agreement as to a future prosecution would be relevant to his credibility and the jury

14  is entitled to know of it." The existence of his favorable treatment could be a circumstance why he had

15  to say something about seeing guns. This would be important impeachment material. As also stated in

16  Jimenez, "Evidence that would enable effective cross-examination and impeachment may be material

17  and that nondisclosure of such evidence may deprive an accused of a fair trial." Even in his testimony,

18  he stated that the police told him that guns were stolen, at p. 19 of his testimony, ll. 15-17; "and they said

19  guns were stolen, and I said ok, that's what was stolen."

20         c.    His Sentence Denies Him Equal Protection of the Law.

21           If there was a nunc pro tunc order as to one defendant (Cecil Harvey), the same

22  order should have applied to Mr. Igbinovia. There could not be a stronger case for more similar classes

23  of persons in like circumstances than these two defendants.

24          If there was indeed a clerical error with regard to Harvey, the clerical error would likewise apply

25  with respect to Mr. Igbinovia. Equal protection of the law has long been recognized to mean that no class

26  of person shall be denied the same protection of the law which is enjoyed by other classes in like

27  circumstances. Snow, at 521. An evidentiary hearing is therefore required on this matter in order to

28  determine whether or not Mr. Igbinovia's Equal Protection rights as well as whether or not the illogically

1  disproportionate sentences violated his 8th and 14th Amendment Rights. The Fourteenth Amendment

2  means that no person or class of persons is denied the same protection of the laws, which is enjoyed by

3  other persons or other classes in the same place and under like circumstances. The general doctrine is

4  that that amendment, in respect of the administration of criminal justice, requires that no different degree

5  or higher punishment is imposed on one than is imposed on all for like offences. Moore v. Missouri, 159

6  U.S. 673 (1895)  See, United States v. Caperna, 251 F.3d 827 (9th Cir. 2001), holding that a district

7  court may depart from an applicable guidelines range on the basis of co-defendant sentence disparity if

8  the co-defendant used as a barometer for judging the disparity was convicted of the same offense as the

9  defendant. Further, The Nevada Supreme Court has noted that the district court had inherent authority

10  to correct a sentence at any time if such sentence was based on a mistake of material fact that worked

11  to the extreme detriment of defendant Passanisi v. State, 108 Nev. 318  (1992). Further, the Nevada

12  Supreme Court has stated in Gaines v. State, 116 Nev. 359 (2000), that The Equal Protection Clause

13  of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, mandates that all persons similarly situated

14  receive like treatment under the law. Gaines, at 359.   Again, this error is of constitutional magnitude

15  and requires review.

16             d.       The ineffective counsel violations.

17             Clearly Mr. Igbinovia's trial counsel was ineffective for failing to sever his

18  Ex-Felon in possession of a weapon from the proceedings. Likewise, there was no limiting instruction.

19  This was tantamount with impeachment of a defendant with a prior felony even though he did not testify,

20  it cannot be considered sound strategy. Even though the case of Brown v. State, 114 Nev. 1118 (1998)

21  was decided after his trial, and stated that in order to ensure fairness in those future cases where the State

22  seeks convictions on multiple counts, including a count of possession of a firearm by an ex-felon

23  pursuant to NRS 202.360, that severance of counts pursuant to NRS 202.360 is required; here, there was

24  not even a limiting instruction requested. Had he raised the issue, he would have had reversal. This is

25  but one factor dealing with trial counsel's performance, which led to the conviction of an individual who

26  is not guilty.

27             Additionally, the discovery contained Villanueva's statement to the police that one of the

28  shotguns was stolen, such that he could have been thoroughly impeached when he tendered a legitimate

1   explanation for his acquisition of the gun; also, his lying about the alleged receipt was amply
2   demonstrated by the fact that this phantom receipt was not in any discovery.

3     The failure to raise these points cannot be considered sound strategy, but rather deficient
4   performance. See, State v. Love, 109 Nev. 1136  (1993), in which the Supreme Court ordered an
5   evidentiary hearing on appeal, and after said remand and hearing the failure to adequately investigate
6   defensive evidence, among other things, constituted deficient performance and required a new trial.
7   Here, the failure to bring out the fact that his shotgun was stolen cannot be considered sound strategy,
8   and the failure to check with the establishment where he supposedly bought the SKS, when no such
9   evidence of a legitimate purchase appeared anywhere constituted deficient performance falling below
10  an objectively reasonable standard. appears that perhaps he did not review the discovery adequately, and
11  was ill prepared to try this case.

12    e.  Totality of All of These Factors.

13    The totality of all of these factors establishes that a fundamental miscarriage of
14  justice occurred, the new evidence claim has been promptly raised, and there is thus good cause for the
15  waiver of any time limitations. He has presented facts, which if true, would entitle him to relief.
16  Therefore, an evidentiary hearing is warranted.

17     **FACTUAL BACKGROUND**

18    The procedural and factual history of this case cries out for relief. Mr. Igbinovia and Harvey were
19  codefendants, and were charged with Burglary While in Possession of a Firearm; First Degree Kidnaping
20  with use of a deadly weapon, Conspiracy to commit robbery with use of a deadly weapon, Coercion with
21  use of a deadly weapon, and possession of a firearm by an ex-felon. He was convicted, and is serving
22  a sentence of 14-62 years with enhancement. See Judgment, attached.

23    At his trial, Joe Villanueva claimed that he was robbed of three guns.  Villanueva claimed that
24  his SKS rifle was purchased at one American Shooter's Supply, p.14, ll. 8-18, unlike his preliminary
25  hearing testimony that he bought it at the American Gun Club. He stated to the jury that he had a receipt
26  for it, that he gave the receipt to the police officer, who took down the information, and gave it back to
27  him. March 3 testimony, p. 91, l. 92, ll.1-5. He also stated that he watched the defendants jump in the
28  car, he chased them into the street, Testimony, p.34, ll. 1-23, and no gun was dropped, that he was so

1  close that he could have heard the gun drop if there was no noise, Testimony, p.52, ll. 1-24. He also said

2  the he thought Leslie Long was part of it, even though Leslie Long was not charged, p.54, ll. 12-14, and

3  that he could see Leslie Long in the car, p.80, ll. 18-20.

4       In the discovery exchanged in the case at bar, there was never any mention by the police of any

5  receipt(s) for the purchase of the gun. See discovery, attached. Further, the alleged victim stated that he

6  obtained another shotgun from his mother, and another one he purchased from a friend. He told this to

7  the police at first, but then back off his legitimate explanation for the acquisition of at least one of the

8  guns, telling the police later, that "the shotgun, indeed, was stolen." Discovery, p. 3. He testified at the

9  preliminary hearing that he bought it from a friend, See Preliminary hearing. Thus the state had two

10  chances to correct the perjury but did not do so. He also stated that he bought the gun at the American

11  Gun Club, as opposed to his testimony in front of the jury. It is no wonder that he now subsequently been

12  convicted of several felonies, and is serving time in a federal institution, having previously served time

13  in the Nevada State prison system.   These are two instances regarding three of the alleged stolen guns,

14  where he lied to the jury. He did not want the jury to know, and the state did not want the jury to know,

15  that he was involved in stolen guns, and therefore cannot provide legitimate explanations for his

16  acquiring them.  The state made no effort whatsoever to correct the witness's story about the purported

17  legitimate acquisition of the guns, thus unfairly prejudicing the defendant's rights to a fair trial. Not only

18  did they not correct it, but in the state's closing argument, the prosecutory argued that Villanueva would

19  be legitimate, or he would have to sell guns at very cheap prices, rather than being involved in stolen

20  guns, (which was well known to the state).  Argument, p. 6, ll. 1-8. The state materially misled the jury

21  with argument and facts known to be false. Showing that he dealt in trafficking of stolen items would

22  have lent more credibility to the position of the defense that Villanueva was an illicit marijuana dealer,

23  and that this was the reason they were at his place. This would have given more credibility to Harvey's

24  testimony, and therefore less credibility to the tale wove by Villanueva. There was a Motion in Limine

25  filed prevented the defense from asking about illicit activities of selling marijuana. It was granted.

26  Villanueva admitted that he was involved in stolen weapons, the court very well may have allowed this

27  line of questioning. Villanueva misled the court, misled the jury, and the state full well know it. See

28  Motion in Limine, filed.

APP. 111

1    Leslie Long, was given favorable treatment, by not being charged. He was, however, arrested.
2   The state went so far as to call him a conspirator, Argument, p. 15, ll. 10-20.  The state argued that Long
3   helped plan the robbery. Argument, p.6, ll. 14-20.  The state also supported this by stating that it was
4   Long who told the defendants about the guns they could get. Argument, p.7, ll. 2-7, and argued that the
5   three of them had planned to do the robbery, p.7, ll. 22-23. Interestingly, the state said in front of the
6   court at a pre-hearing, that Long wasn't at the defendant table, because "I wasn't screaming enough."
7   p. 5, ll. 9-13.

8       Additionally, it appears Long was led by the police. At his testimony, p.38, ll. 8-9, Long states
9   that the police asked him "is it possible it could have been a 38?  It is obvious that there was some
10   reason Long was not prosecuted which is not on the record.  By the state's argument, there was more
11   than enough to charge him yet. He was on the state's witness list. ROA, p.80, ll. 2. Long stated that the
12   12 gauge was dropped by Cecil at the car he was driving and left there. Testimony of Leslie Long, p.37,
13   ll. 12-18.  Long did state that he saw no guns on either of them when they went to buy the marijuana.
14   Testimony, p.30, ll. 10-14.Villanueva stated that he chased the car out of the parking lot. Testimony of
15   Villanueva, p. 34, ll. 1-23. He denied seeing a gun dropped, p. 52, ll. 1-24.  These two statements cannot
16   be reconciled, this demonstrates further the materially illogical and irreconcilable flaws in this case.
17   Villanueva got as close to the car as a witness to the counsel table, but somehow did not recover the
18   dropped guns.  Testimony of Leslie Long, p. 11, ll. 24-25, p.12, ll. 1-5.

19       There were more things said by Long that are suspect. He stated he guessed that the purported
20   gun that Mr. Igbinovia supposedly clicked was not loaded, and therefore Villanueva gave chase. It is
21   more probable that neither defendant had a gun in the first place.

22       There is more about Leslie Long. He was arrested by the police, and while in their control, gave
23   somewhat of a mixed statement. He apparently received special treatment in exchange for his statement
24   by not being charged at all, as stated earlier, he was called a conspirator in the prosecutor's argument,
25   He was actually arrested by the police, March 4 testimony, p. 10, l. 23.  He stated that he was arrested,
26   p. 41, l 1-4, and finally admitted that he was talked to prior to his interview being typed, and that he
27   knew what they wanted. Testimony, p. 41, ll. 20-25.  He clearly had a motive to appease the police.
28   However, he still stated that this was simply a marijuana deal, that he was giving the defendants a ride.

1   He stated that the defendants were not satisfied with the marijuana deal, and that a fight ensued, with
2   Villanueva starting the fight.

3          As already stated, a weapon was "dropped." See Discovery, p. 3.  No weapons were ever
4   recovered. There appears to have been informal special treatment given to this witness, which provided
5   a motive for him to say something inculpatory about the incident with respect to Mr. Igbinovia and
6   Harvey.

7          The defendants' residences were searched, and nothing of any kind to link the defendants to the
8   alleged crime was found. See Discovery, pages 5-6.  From the beginning, Mr. Igbinovia denied the
9   robbery and said it was a misunderstanding. Discovery, p.4-5.  This backs up the defense that no
10  weapons were taken, that no robbery occurred. Further, the police were not immediately called, as
11  commented by the prosecutor in his closing argument.

12         Additionally, it bears mentioning that a person who was pistol whipped and robbed of guns is
13  unlikely to have actively pursued two armed assailants.  Villanueva's testimony was easily capable of
14  being challenged. That is why his perjury, if brought out by the state, would have caused a different
15  result.

16         Long also testified that Villanueva was chasing them with what appeared to be a gun in his hand.
17  Testimony of Leslie Long, p.10, ll.10-15. How could Villanueva, who was purportedly pistol whipped
18  and robbed of his guns, actively pursue two healthy and uninjured assailants who supposedly were in
19  possession of his guns they had stolen from him? Additionally, the fact that Long waited ten minutes
20  for the defendants is more supportive of two separate encounters at Villanueva's place, a marijuana deal
21  going bad, and the purchasers coming back, then a robbery, which would not have taken ten minutes.
22  Testimony of Leslie Long (p. 9, l. 21).

23         It is also questionable why Villanueva did not immediately call the police. It is interesting to note
24  that no guns were found in Villanueva's place despite Long's statement that he saw Villanueva chase
25  them with a gun.

26         Harvey also testified that he was "shorted" of marijuana he had paid Villanueva for.  Testimony,
27  p.101, ll. 4-7. Harvey further testified that he never saw the alleged SKS (p. 93, ll. 18-22), and that they
28  left with no guns, no money. (P..82, ll. 2-8) Harvey explained the cut to Villanueva was caused by his

12

1  nugget ring (Testimony, p. 87, ll. 17), that he had no gun (p. 72, ll. 10-12), and that he went to buy a bag

2  of weed (p. 73, ll. 25, p. 74, l. 1). He said an argument ensured about being ripped off, p. 80, ll. 1-26,

3  that Villanueva told them to leave and pulled a pistol, p. 82, ll. 1-25, and that he only briefly saw Sabrina

4  (Villanueva's girlfriend)(p. 86, ll. 23-5). He also testified that during the struggle Villanueva said he

5  was going to "smoke" them, and they fled (p. 87, ll. 1-12), that they ran into the parking lot (p. 88, ll.

6  19-25), he never saw guns (p. 93, ll. 18-22), and they left totally empty handed, (p. 97, ll. 18-25).

7  　　　Clearly, the testimony of Villanueva, and his credibility was crucial. He perjury was not only

8  suppressed, but the state extolled his legitimate acquisition of guns in his argument, willfully creating

9  a false impression. Additionally, the clear special treatment of Leslie Long, an original state's witness

10  was not stated.

11  **THE SUBSEQUENT DEVELOPMENTS WITH CO-DEFENDANT HARVEY'S CASE**

12  　　　With respect to Harvey, the District Court held an evidentiary hearing without the presence of

13  the defendant, and the Supreme Court reversed and ordered an evidentiary hearing. See opinion of

14  remand, attached.

15  　　　From there the procedural history of Harvey's case proceeded in a most unusual way. There was

16  a Nunc Pro Tunc Order that dismissed his enhancement count without prejudice. See attached

17  stipulations to continue and stipulated amended judgments. There seems to be no legal basis for

18  dismissing part of a conviction case via a Nunc Pro Tunc, much less without prejudice. This type of

19  stipulated result raises more questions than it answers concerning the miscarriage of justice that

20  occurred. It is clear that the state had serious issues concerning proceeding with an evidentiary hearing,

21  such that the state was willing to pave the way for Harvey's matriculation into society via what appears

22  to be a total legal fiction.

23  **THE DISCOVERY OF WHAT VILLANUEVA TOLD FEASTER**

24  　　　In April 2005, the newly discovered evidence materialized. Feaster's statement explains that Joe

25  Villanueva made up the story about the robbery and that he was hiding guns for Villanueva at his request

26  because he was "hot." See statement, attached. This statement shows that Villanueva lied about the

27  incident, and that Mr. Igbinovia is, (as he has always maintained) not guilty. Villanueva's original

28  admission to the police that he had a stolen shotgun would constitute a motive for him to ask Feaster to

1  hold his guns until things blew over and further corroborates Feaster's Affidavit.  If he had no receipt

2  for the SKS and false information about place of purchase was provided by Villanueva, it, too, could

3  have been stolen, thus providing more incentive for Feaster to hold several guns for Villanueva.

4  Likewise, the lack of any guns being found, anywhere, corroborates the statement of Feaster, as does

5  the testimony of Harvey, who is now out of prison.  (Yet given the possible reasons for his dismissal

6  without prejudice, it is highly likely Harvey's self interest will preclude him from giving too much

7  information to assist Mr. Igbinovia.)

8       If Feaster's statement is true, when coupled with the other issues in this case, Mr. Igbinovia

9  would not have been convicted. Therefore, an evidentiary hearing is required, and there exists good

10  cause for allowing his hearing to go forward, just as Harvey's hearing was ordered to go forward. The

11  manifest injustice that occurred in his case, as well as the newly discovered evidence, makes this writ

12  ripe for hearing. Harvey has been released from prison, having obtained post-conviction relief, and Mr.

13  Igbinovia stands to spend the rest of his life in prison.

14       Points and Authorities are submitted, and Mr. Igbinovia reserves the right to amend and

15  supplement these pleadings in the interests of justice as the facts develop.

16  **POINTS AND AUTHORITIES**

17  A.  **THE NEWLY DISCOVERED EVIDENCE CONSTITUTES GOOD CAUSE TO**

18      **CONSTITUTE A WAIVER OF ANY PROCEDURAL BAR**

19  NRS 34.726 states as follows:

20      NRS 34.726 provides for dismissal of habeas petitions based on delay in filing. It states, in part:

21      1. Unless there is good cause shown for delay, a petition that challenges

22      the validity of a judgment or sentence must be filed within 1 year after entry of the judgment of conviction or, if an appeal has been taken from

23      the judgment, within 1 year after the supreme court issues its remittitur. For the purposes of this subsection, good cause for delay exists if the petitioner demonstrates to the satisfaction of the court:

24

25      (a) That the delay is not the fault of the petitioner; and

26      (b) That dismissal of the petition as untimely will unduly prejudice the petitioner.

27      There is ample precedent for the time bar waiver. The Nevada Supreme Court may excuse the

28  failure to show cause where the prejudice from a failure to consider the habeas claim amounts to a

14

1  "fundamental miscarriage of justice." <u>Pellegrini v. State</u>, 117 Nev. 860 (2001). The must be a sufficient

2  basis to show good cause to excuse the procedural bars or to conclude that a fundamental miscarriage

3  of justice would have occurred from the failure to consider his claims for relief on the merits. <u>Pellegrini</u>,

4  at 863.. The supreme court has recognized that this standard can be met where the petitioner makes a

5  colorable showing he is actually innocent of the crime. <u>Pellegrini</u>, at 863.

6       To overcome the procedural bars of Nev. Rev. Stat. §§ 34.726 and 34.810, the habeas petitioner

7  has the burden of demonstrating good cause for delay in bringing his new claims or for presenting the

8  same claims again and actual prejudice. To show "good cause," the petitioner must demonstrate that an

9  impediment external to the defense prevented him from raising his claims earlier. For example, such an

10  impediment might be demonstrated by a showing that the factual or legal basis for a claim was not

11  reasonably available. <u>Pellegrini</u>, at 863.

12       Here, the statement of Feaster was obtained in April, 2005, and this provides good cause to allow

13  a hearing in this case. It shows that a fundamental miscarriage of justice has occurred. It is a substantial

14  statement that ties everything together, and thus demonstrates that Mr. Igbinovia would be unfairly

15  prejudiced by not being able to present this evidence. It backs up the defense that they were not there

16  to do a robbery, and that these charges were contrived. It explains in a manner consistence with

17  innocence why no guns were found. The totality of the case makes Feaster's statement powerful, and

18  it is highly likely that after hearing this statement, that no reasonable juror would have convicted Mr.

19  Igbinovia. If the jury believes him, there is no conviction. Feaster's statement is amply corroborated and

20  is consistent with Mr. Igbinovia's claim of innocence.

21       A case on point dealing with the issue of newly discovered impeachment evidence resulted in

22  a new trial. In <u>Hennie v. State</u>, 114 Nev. 1285 (1998), the Defendant was convicted of grand larceny,

23  burglary, felony theft from a vending machine, and attempted felony theft of a vending machine based

24  largely on circumstantial evidence and the testimony of two key witnesses: defendant's roommate and

25  landlord. After defendant's trial, defendant came into possession of newly discovered evidence that the

26  witnesses had been involved in a criminal conspiracy to murder the landlord's wife, and that the

27  roommate was substantially indebted to the landlord. The trial court denied defendant's motion for a new

28  trial based on the new information. The Supreme Court reversed because the impeachment evidence was

1  sufficient to grant a new trial. The importance of the witnesses' testimony in convicting defendant,

2  knowledge of the conspiracy and its impact on the witnesses' credibility was extremely material to

3  defendant's case. A different result would have been probable had the jury been presented with the newly

4  discovered evidence. Because of the critical nature of the witnesses' testimony and the probability of a

5  different verdict had they been further impeached, the newly discovered impeachment evidence justified

6  a new trial.  The Court stated at p. 1285, that "[n]ewly discovered impeachment evidence may be

7  sufficient to justify granting a new trial if the witness impeached is so important that impeachment

8  would necessitate a different verdict."

9       The general standard for a new trial based on newly discovered evidence as follows: (1) the

10  evidence must be newly discovered; (2) it must be material to the defense; (3) it could not have been

11  discovered and produced for trial even with the exercise of reasonable diligence; (4) it must not be

12  cumulative; (5) it must indicate that a different result is probable on retrial; (6) it must not simply be an

13  attempt to contradict or discredit a former witness; and (7) it must be the best evidence the case admits.

14  Hennie, supra. The Supreme Court in Hennie reversed due to the substantial impeachment evidence

15  showing motive. Here, this evidence is more than motive, it directly, rather than collaterally, impeaches

16  Villanueva and substantially casts into question whether the offense happened at all.

17       In this case, Feaster's testimony is corroborated by many things: Villanueva's credibility would

18  have crumpled had the jury heard what he told Feaster. This is substantial.

19       Our Supreme Court has stated that a writ is available even if the two year statute of limitations

20  for newly discovered evidence has passed. In Snow v. State, 105 Nev. 521 (1989), the defendant filed

21  an out of time motion for new trial based upon newly discovered evidence. The court stated the

22  following:

23       While the two-year statute of limitations imposed by NRS 176.515(3) precluded direct review

24  of Snow's conviction, Snow was still able to seek collateral review of his claimed newly discovered

25  evidence by petitioning for a writ of habeas corpus. The writ of habeas corpus is available "to allow the

26  presentation of questions of law which cannot otherwise be reviewed, or that are so important as to

27  render ordinary procedure inadequate and justify the extraordinary remedy." Director, Dep't of Prisons

28  v. Arndt, 98 Nev. 84, 85, 640 P.2d 1318, 1319 (1982); see also, State ex rel. Orsborn v. Fogliani, 82

16

1   Nev. 300, 417 P.2d 148 (1966).

2   **B.      THE DEFENDANT'S CONVICTION WAS OBTAINED BY THE KNOWING USE OF**
            **PERJURED TESTIMONY, AND HIS CLAIM IS THEREFORE NOT TIME BARRED.**
3           **LIKEWISE, THE PROSECUTOR SUPPRESSED EXCULPATORY EVIDENCE**

4           When police or prosecutors conceal significant exculpatory or impeaching material in a state's

5   possession, it is ordinarily incumbent on the state to set the record straight. Further, the prosecution's

6   deliberate or willfully blind deception of a court and jurors by the presentation of known false evidence

7   is incompatible with rudimentary demands of justice. A rule declaring "prosecutor may hide, defendant

8   must seek," is not tenable in a system constitutionally bound to accord defendants due process. Banks

9   v. Dretke, 540 U.S. 668 (2004).   Ordinarily, courts presume that public officials have properly

10  discharged their official duties. Courts underscore the special role played by the American prosecutor

11  in the search for truth in criminal trials. Courts, litigants, and juries properly anticipate that obligations

12  to refrain from improper methods to secure a conviction, plainly resting upon the prosecuting attorney,

13  will be faithfully observed. Prosecutors' dishonest conduct or unwarranted concealment should attract

14  no judicial approbation.   The requirement of due process, in safeguarding the liberty of the citizen

15  against deprivation through the action of the state, embodies the fundamental conceptions of justice

16  which lie at the base of American civil and political institutions. It is a requirement that cannot be

17  deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the

18  pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a

19  deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance

20  by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the

21  rudimentary demands of justice as is the obtaining of a like result by intimidation. Mooney v. Holohan,

22  294 U.S. 103 (1935).

23          In this case, the prosecutor idly stood by while Villanueva claimed that a gun was given to him

24  by his mother. Villanueva had earlier told police that this was a stolen gun. A prosecutor bent on victory

25  at trial, no matter the cost, would not want their alleged victim portrayed like this.   A jury might

26  legitimately conclude that if the purported victim cannot get his stories straight about how he got the

27  guns, perhaps he did not have them at all. Additionally, such information would have informed the jury

28  the Villanueva dealt in stolen weapons: not exactly the victim that brings out sympathy.   Further, the

1   state stood idly by when they were aware or should have been aware that his story about sharing receipt

2   information with the police was more perjury. When these lies are coupled with Villanueva's newly

3   discovered statement to Feaster and Villanueva's asking Feaster to hide his guns, the credibility of

4   Villanueva, and the state's case, would have been damaged beyond repair and in all probability, Mr.

5   Igbinovia would not have been convicted.

6          Procedural hurdles can be overcome if the petitioner can demonstrate either "cause and actual

7   prejudice," e.g., Murray v. Carrier, 477 U.S. 478, 489, 91 L. Ed. 2d 397, 106 S. Ct. 2639, or that he is

8   "actually innocent." Id., at 496. Bousely v. United States, 523 U.S. 614 (1998). Clearly, then, in this

9   case a conviction obtained by the use of perjured testimony provides a time bar waiver on both basis.

10          In Bousley, the petitioner plead to a count of using and carrying a gun during and in relation to

11   a drug trafficking crime. Upon the reinterpretation of this law in Bailey v. United States, 516 US 137,

12   (1995) defendant's plea was allowed to be set aside, despite the fact that such an action would be

13   procedurally time barred. The Supreme Court reversed the Eight Circuit's holding in that case that his

14   claim was time barred. The Supreme Court stated that Petitioner's claim may still be reviewed in this

15   collateral proceeding if he can establish that the constitutional error "has probably resulted in the

16   conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. at 496. To establish actual

17   innocence, petitioner must demonstrate that, "'in light of all the evidence,'" "it is more likely than not that

18   no reasonable juror would have convicted him." Schlup v. Delo, 513 U.S. 298, 327-328, 130 L. Ed. 2d

19   808, 115 S. Ct. 851 (1995) (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal

20   Judgments, 38 U. Chi. L. Rev 142, 160 (1970)).

21          In that case, the Supreme Court held there was no procedural default if, that good cause existed

22   if there was constitutional error that resulted in the conviction of an innocent person.

23          In the instant case, Villanueva perjured himself. Yet, even at his trial, the explanation of the legal

24   possession of the guns went unnoticed, despite the fact that he told the police he lied about a seemingly

25   innocent and legitimate acquisition of the shotgun(s), and there was no mention of any alleged receipt

26   anywhere in any statement by the police or in the arrest report. The statement of Feaster is substantial,

27   and the miscarriage of justice constitutes a valid waiver of the time limits. Due diligence is not an issue

28   here, and case law allows a hearing based upon new evidence of this type available by way of a habeas

1   corpus hearing, as stated above in Snow, supra.  Further, a hearing is required to see just what problems

2   really existed in the state's case that were buried by the legal fiction of a nunc pro tunc order dismissing

3   a case without prejudice.  This disparate results should not summarily hinge on time limits.

4         As stated before, the state attorney is charged with constructive knowledge and possession of

5   evidence withheld by other state agents, such as law enforcement officers.  Jimenez v. State, 112 Nev.

6   610 (1996).   The state, then would know that there was no legitimate gun purchase at American Shooter

7   Supply, otherwise there would have been a receipt which would have been in the possession of a

8   government agency. It follows that this was another stolen weapon. This is more impeachment evidence

9   that would have been favorable to the defense that was not disclosed. Not only did the prosecutor fail

10  to verify this or even attempt to do so, they violently opposed attempts to find this out.  The facts of this

11  tie in with the Jimenez case, and is further bolstered the United States Supreme Court in Kyles v.

12  Whitley, 514 U.S. 419  (1995). In Whitley, the Petitioner was convicted of first-degree murder. He

13  appealed, claiming that the state knew of evidence favorable to him before and during trial that it failed

14  to disclose. The state supreme court remanded the case for an evidentiary hearing on defendant's claims

15  of newly discovered evidence. The trial court, after review, denied relief. The state supreme court denied

16  petitioner's application for discretionary review. A petition for habeas corpus was then filed in district

17  court, which denied the petition. The court of appeals affirmed by a divided vote. The Supreme Court

18  granted certiorari and reversed and ordered a new trial, holding that the net effect of the evidence

19  withheld by the State in this case raised a reasonable probability that its disclosure would have produced

20  a different result. The Supreme Court held the following:

21            1.    The Prosecution Has an Affirmative Duty to Disclose Evidence
                    Favorable to a Defendant. The Suppression by the Prosecution of
22                  Evidence Favorable to an Accused upon Request Violates Due
                    Process Where the Evidence Is Material Either to Guilt or to
23                  Punishment, Irrespective of the Good Faith or Bad Faith of the
                    Prosecution.
24

25        Here, then, it is not a matter of good faith that the lack of a real purchase at the American

26  Shooter's supply was not inquired, since the state is charged with knowledge of other law enforcement

27  agencies. This fact would have been clearly exculpatory to the defense, particularly in light of what also

28  was said by the Supreme Court:

1 | ///

2.    There is no difference between exculpatory and impeachment evidence for Brady purposes, and there is no longer a distinction between the "specific-request" and "general- or no-request" situations.

3.    Under one factor of the Bagley test, although the constitutional duty to disclose evidence is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal, whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant. The touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

The Supreme Court then talked about the Bagley test in the Syllabus: Under United States v. Bagley, 473 U.S. 667, 87 L.Ed. 2d 481, 105 S. Ct. 3375, four aspects of materiality for Brady purposes bear emphasis. First, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Thus, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. 473 U.S. at 682, 685. United States v. Agurs, 427 U.S. 97, 112-113, 49 L.Ed. 2d 342, 96 S. Ct. 2392, distinguished. Second, Bagley materiality is not a sufficiency of evidence test. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Third, contrary to the Fifth Circuit's assumption, once a reviewing court applying Bagley has found constitutional error, there is no need for further harmless-error review, since the constitutional standard for materiality under Bagley imposes a higher burden than the harmless-error standard of Brecht v. Abrahamson, 507 U.S. 619, 623, 123 L. Ed. 2d 353, 113 S. Ct. 1710. Fourth, the state's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on the

1   evidence considered item by item. 473 U.S. at 675, and n. 7.

2       Thus, the prosecutor, who alone can know what is undisclosed, must be assigned the

3   responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of

4   "reasonable probability" is reached. Moreover, that responsibility remains regardless of any failure by

5   the police to bring favorable evidence to the prosecutor's attention. To hold otherwise would amount to

6   a serious change of course from the Brady line of cases. As the more likely reading of the Fifth Circuit's

7   opinion shows a series of independent materiality evaluations, rather than the cumulative evaluation

8   required by Bagley, it is questionable whether that court evaluated the significance of the undisclosed

9   evidence in this case under the correct standard.

10       As the state is charged with notice of the registration, or in this case, the lack of it, the state

11   possessed crucial impeachment evidence that was not disclosed, in contravention of Jimenez and Kyles.

12   Allowing this perjury constituted a material Brady violation, which omission undermines confidence in

13   the outcome, irrespective of any finding of bad faith. An evidentiary hearing is clearly required to

14   determine if and why this evidence was suppressed. This could have been one of the reasons that the

15   state dealt Harvey's writ via the suspect Nunc pro tunc (clerical error) dismissal of the enhancement

16   without prejudice. Further, as stated earlier, suspiciously the state vigorously opposed any attempts to

17   ascertain evidence of registration of this SKS shotgun by Villanueva.

18       There is also, as stated earlier, the issue with the apparent nondisclosed favorable treatment of

19   Long. He was subpoenaed by the state, and he was not charged. The fact that the defense chose to call

20   him is not pertinent. He was granted concessions by not being prosecuted. This would have been crucial

21   impeachment material had it been disclosed.  Once more, the nondisclosure of this impeachment

22   material is more suppression of evidence favorable under Kyles, where the Supreme Court articulated

23   that there was no difference between " exculpatory and impeachment evidence for Brady purposes, and

24   there is no longer a distinction between the "specific-request" and "general- or no-request" situations."

25       Also in support of the state's duty to reveal favorable treatment to not just informants, but also

26   to witnesses, is found in Jimenez v. State, 112 Nev. 610 (1996) which held that the prosecutor's motive

27   or reason for withholding exculpatory evidence is immaterial. Additionally, the state attorney is charged

28   with constructive knowledge and possession of evidence withheld by other state agents, such as law

1  enforcement officers, and that "the prosecution's duty to disclose exculpatory or impeachment evidence

2  is not limited to situations where the state admits that it made a deal with an informant. Where the

3  credibility of a witness is an important issue in the case, evidence of any understanding or agreement as

4  to a future prosecution would be relevant to his credibility and the jury is entitled to know of it."

5  Jimenez v. State, 112 Nev. 610 (1996). The Jimenez court also held that "Evidence that would enable

6  effective cross-examination and impeachment may be material and that nondisclosure of such evidence

7  may deprive an accused of a fair trial" and that "[e]vidence that would enable effective

8  cross-examination and impeachment may be material and that nondisclosure of such evidence may

9  deprive an accused of a fair trial."

10       In Jimenez, the defendant, in appealing his denial of habeas corpus relief in the trial court,

11  contended that 1) the state violated its constitutional duty to inform him of exculpatory evidence; 2) the

12  state failed to divulge evidence relevant to the impeachment of its informant witness, who lied under

13  oath; and 3) the trial court erred in its instructions to the jury. The court overturned the defendant's

14  conviction and ordered a new trial based on the state's violation of its constitutional duty to disclose

15  material evidence to the defense. In so holding, the court found that 1) the combination of the trial court's

16  order of full discovery and the defense counsel's attempt to examine certain witnesses as to the

17  undisclosed evidence constituted the functional equivalent of a specific request for certain information

18  from the state; 2) the evidence improperly withheld by the state was material to the defendant's case; 3)

19  impeachment evidence improperly withheld by the state regarding its informant was material to the

20  defendant's case.

21       In the instant case, Long was arrested for the alleged robbery. Testimony of Officer Bernini, p.

22  10, l. 23. He was called a conspirator and planner by the prosecutor in the state's final argument. He was

23  led by the police in his statement. The state made some feeble explanation about why he was not

24  charged, (that the prosecutor did not "scream loud enough"). This begs the question:  What favorable

25  treatment did he get for saying something incriminating about the incident?  It appears that he got

26  favorable treatment, and thus a hearing is required to explore this prima facie showing of favorable

27  treatment.  Consistent with Jimenez, such treatment should have been revealed.

28       There are two instances of material perjury that the prosecution let stand.  It was compounded

1  by the state's closing argument, which vigorously suppressed any notion that Villanueva would have

2  anything but legitimately obtained guns. Additionally, a witness appears to have been given special

3  treatment. These facts were not brought out to the jury.

4      Recently, the United States Supreme Court dealt with similar issues, and further held that due

5  to the violation there was cause to grant relief, irrespective of any procedural bars. In <u>Banks v. Dretke</u>,

6  540 U.S. 668  (2004), Petitioner prison inmate was convicted in state court of felony murder and

7  sentenced to death, but asserted that the prosecution failed to disclose that a key witness was a paid

8  informant and thus knowingly allowed the witness to testify falsely. Upon the grant of a writ of

9  certiorari, the inmate appealed the judgment of the United States Court of Appeals for the Fifth Circuit

10  which reversed a grant of the inmate's habeas corpus petition. It was conceded that the prosecution failed

11  to disclose the informant's status and did not correct the informant's false testimony that he did not talk

12  to police until shortly before trial. The lower appellate court found, however, that the issue of

13  suppression of impeachment evidence concerning the informant was procedurally barred since the

14  inmate failed to pursue the issue in state court proceedings, despite indications of the prosecutorial

15  misconduct. The United States Supreme Court held the inmate's claim was not barred since the inmate

16  showed cause for failing to develop the claim in state court and the impeachment evidence was clearly

17  material. The judgment reversing the grant of the inmate's habeas corpus petition was reversed, and the

18  case was remanded for further proceedings.

19      In Mr. Igbinovia's case, the special treatment was not disclosed, the perjury was not corrected,

20  and the state at the very least ignored their constructive notice that the gun in all probability was not

21  registered, and that Villanueva did not furnish them a receipt as he testified. If this is true, Mr. Igbinovia

22  would be entitled to relief, and his claims are thus not procedurally barred, there being good cause to

23  waive the time bar in <u>Banks</u>.

24      The Supreme court, in reversing, stated the following principles of law in its opinion:

25        1.    When police or prosecutors conceal significant exculpatory or

26  impeaching material in a state's possession, it is ordinarily incumbent on the state to set the record straight,

27        2.    A habeas corpus petitioner is entitled to an evidentiary hearing in

28  federal court if he can show cause for his failure to develop facts in state-court proceedings and actual prejudice resulting from that

23

1  failure,

2  3.   The suppression by the prosecution of evidence favorable to an
3       accused upon request violates due process where the evidence is
        material either to guilt or to punishment, irrespective of the good
4       faith or bad faith of the prosecution. The following are the three
        components or essential elements of a Brady prosecutorial
5       misconduct claim: that the evidence at issue must be favorable to
        the accused, either because it is exculpatory, or because it is
6       impeaching; that evidence must have been suppressed by the
        state, either willfully or inadvertently; and that prejudice must
7       have ensued. Corresponding to the second Brady component
        (evidence suppressed by the state), a petitioner shows "cause"
8       when the reason for his failure to develop facts in state-court
        proceedings was the state's suppression of the relevant evidence;
9       coincident with the third Brady component (prejudice), prejudice
        within the compass of the "cause and prejudice" requirement
10      exists when the suppressed evidence is material for Brady
        purposes,

11  4.   Prosecutors are responsible for any favorable evidence known to
        others acting on the government's behalf in the case, including the
12      police,

13  5.   The prosecution's deliberate deception of a court and jurors by the
        presentation of known false evidence is incompatible with
14      rudimentary demands of justice, and, for purposes of this case,

15  6.   A rule declaring "prosecutor may hide, defendant must seek," is
        not tenable in a system constitutionally bound to accord
16      defendants due process. Ordinarily, courts presume that public
        officials have properly discharged their official duties. Courts
17      underscore the special role played by the American prosecutor in
        the search for truth in criminal trials. Courts, litigants, and juries
18      properly anticipate that obligations to refrain from improper
        methods to secure a conviction, plainly resting upon the
19      prosecuting attorney, will be faithfully observed. Prosecutors'
        dishonest conduct or unwarranted concealment should attract no
20      judicial approbation.

21      In the instant case, the actions of the state fit squarely into the holding in the <u>Banks</u> case. These

22  principles are fundamental, and the way Mr. Igbinovia's case went through the system presents

23  substantial violations that would certainly excuse any time bar waiver, particularly here, as there are

24  substantial questions of his factual innocence. The state allowed the perjury to occur when Villanueva

25  represented the shotgun to be a gift from his mother, when it was in fact a stolen weapon. They are

26  charged with constructive notice that there was not a receipt for the SKS, as testified to, and were aware

27  that the gun was not purchased at the American Shooters, as represented. (They resisted, rather than

28  come forward, with this evidence, even to and through Harvey's writ, finally allowing the nunc pro tunc

1   to bury the issue.)

2        An evidentiary hearing is clearly required in order to develop these issues. Mr. Igbinovia presents

3   far more substantial claims than those presented by Harvey, yet Harvey is now free while Igbinovia sits

4   in prison for many years to come on the same charges.

5   **C.**     <u>**THE NUNC PRO TUNC ORDER RAISES ISSUES AND SUSPICIONS IN THIS CASE**</u>

6       <u>**THAT REQUIRE AN EVIDENTIARY HEARING**</u>

7        Although it was stipulated, the nunc pro tunc which freed Harvey and vitiated his need for a

8   hearing does not comply with the true definition of a Nunc Pro Tunc order, which is defined as follows:

9          § 155.127. Order nunc pro tunc to correct previous order: Issuance; form;
         use of original order; manner of correction

10          1.     If through inadvertence or mistake an order entered fails to state
             correctly the order made by the court, and the inadvertence or

11              mistake is brought to the attention of the court by petition or the
             court acts on its own motion, the court may enter an order nunc

12              pro tunc correcting the previous order

13        Clearly, Harvey's freedom was obtained not through a true nunc pro tunc situation but rather a

14   legal fiction. This draws more suspicion to the serious problems the state had with this case. These

15   problems could range all the way from knowing perjury to facts within the possession of the state that

16   would make conviction unlikely if they were brought forward and further corroborates Mr. Igbinovia's

17   claims of factual innocence.

18        Additionally, it cannot be both ways. If Harvey's sentence was the result of a clerical error, then

19   Mr. Igbinovia should receive the same order. In any event, he would be entitled to equal protection of

20   the law.

21        As stated earlier and hereby repeated, Equal Protection of the law has long been recognized to

22   mean that no class of person shall be denied the same protection of the law which is enjoyed by other

23   classes in like circumstances. <u>Snow</u>, at 521. An evidentiary hearing is therefore required on this matter

24   in order to determine whether or not Mr. Igbinovia's Equal Protection rights as well as whether or not

25   the illogically disproportionate sentences violated his 8th and 14th Amendment Rights. The Fourteenth

26   Amendment means that no person or class of persons is denied the same protection of the laws, which

27   is enjoyed by other persons or other classes in the same place and under like circumstances. The general

28   doctrine is that amendment, in respect of the administration of criminal justice, requires no different

1  degree or higher punishment is imposed on one than is imposed on all for like offences. See Moore v.

2  Missouri, 159 U.S. 673 (1895). See United States v. Caperna, 251 F.3d 827 (9th Cir. 2001), holding

3  that a district court may depart from an applicable guidelines range on the basis of co-defendant sentence

4  disparity if the co-defendant used as a barometer for judging the disparity was convicted of the same

5  offense as the defendant.

6        Further, The Nevada Supreme Court has noted that the district court had inherent authority to

7  correct a sentence at any time if such sentence was based on a mistake of material fact that worked to

8  the extreme detriment of defendant Passanisi v. State, 108 Nev. 318 (1992). Further, the Nevada

9  Supreme Court has stated in Gaines v. State, that The Equal Protection Clause of the Fourteenth

10 Amendment, U.S. Const. amend. XIV, § 1, mandates that all persons similarly situated receive like

11 treatment under the law. Gaines v. State, 116 Nev. 359 (2000).

12       These defendants could not be more similarly situated. Additionally, Mr. Igbinovia's grounds

13 are stronger, especially with the recently obtained evidence of Feaster's statement, indicating that there

14 were no guns to steal at the time, and that Villanueva fabricated his story. These claims cannot simply

15 be glossed over. Again, this error is of constitutional magnitude and requires review.

16                              **CONCLUSION**

17       An evidentiary hearing is required when: "(1) the petitioner's allegations, if proved, would entitle

18 him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the

19 relevant facts." Terrovona v. Kincheloe, 912 F.2d 1176, 1181 (9th Cir. 1990); see also Townsend v.

20 Sain, 372 U.S. 293, 312-13 (1963). "A conviction obtained by the knowing use of perjured testimony

21 must be set aside if there is any reasonable likelihood that the false testimony could have affected the

22 outcome of the trial." United States v. Sherlock, 962 F.2d 1349, 1364 (9th Cir. 1989) (quoting United

23 States v. Polizzi, 801 F.2d 1543, 1549 (9th Cir. 1986)), cert. denied, 113 S. Ct. 419 (1992).

24       The statement of Feaster is clearly newly discovered evidence that could not be obtained by the

25 use of due diligence. When merged with the knowing perjury, a different result would have resulted. A

26 manifest injustice has occurred and there exists several grounds for the good cause to exist to excuse the

27 normal time bar waiver. Further, an evidentiary hearing must be granted in this case in order for the court

28 to make findings of fact, since what is alleged here is specific and not general, and if found to be true,

APP. 127

1   would entitle your Petitioner to relief.

2       WHEREFORE, your petitioner prays that this matter be set down for evidentiary hearing, that

3   he be allowed to conduct discovery, and that after said hearing, this writ of habeas corpus be granted.

4       Dated this 9 day of August, 2005

5

6                       C. CONRAD CLAUS, ESQ.
ATTORNEY FOR PETITIONER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AFFIDAVIT OF CONRAD CLAUS, ESQ.**

| | |
|---|---|
| STATE OF NEVADA | ) |
| | :ss |
| COUNTY OF CLARK | ) |

C. CONRAD CLAUS, ESQ., being first duly sworn deposes and states:

I am an attorney in good standing with the Nevada State Bar and I am duly licensed to practice law before this Court. That I have been retained by Petitioner to represents his interests in the above entitled matter. That I hereby swear that I know the contents of this pleading, that the pleading is true of my own knowledge, except as to those matters stated on information and belief, and that as to such matters I believe them to be true. I further affirm that I have been specifically authorized by the Petitioner to file this Petition.

_____
C. CONRAD CLAUS, ESQ.

SUBSCRIBED AND SWORN TO
before me this day of August, 2005.

_____
NOTARY PUBLIC in and for
said County and State

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
CHARLENE GONZALES
No: 04-89870-1
My Appointment Expires June 22, 2008

28

EXHIBIT— 06

ORIGINAL

FILED

2005 NOV -21 P 3:02

_____
CLERK

FILED

2005 NOV -21 P 3:

_____
CLERK

1  **ORDR**
2  DAVID ROGER
   Clark County District Attorney
3  Nevada Bar #002781
   JAMES R. SWEETIN
4  Chief Deputy District Attorney
   Nevada Bar #005144
5  200 South Third Street
   Las Vegas, Nevada 89155-2212
6  (702) 455-4711
   Attorney for Plaintiff

7
                    DISTRICT COURT
                CLARK COUNTY, NEVADA
8  THE STATE OF NEVADA,

9               Plaintiff,

10       -vs-

11  ENOMA IGBINOVIA,
    #1191445

12

13              Defendant.

CASE NO:    C146894

DEPT NO:    V

14              FINDINGS OF FACT, CONCLUSIONS OF
                      LAW AND ORDER
15

16              DATE OF HEARING: September 29, 2005
                TIME OF HEARING: 8:30 A.M.
17

18       THIS CAUSE having come on for hearing before the Honorable Jackie Glass, District

19  Judge, on the 29th day of September, 2005, the Petitioner not being present, Represented By

20  C. Conrad Claus, the Respondent being represented by DAVID ROGER, District Attorney,

21  by and through Reuben Cawley, Deputized Law Clerk, and the Court having considered the

22  matter, including briefs, transcripts, arguments of counsel, and documents on file herein,

23  now therefore, the Court makes the following findings of fact and conclusions of law:

24                        FINDINGS OF FACT

25       1.      On March 3, 1998, Enoma Uyg Igbinovia ("Defendant") was charged by way

26  of an Amended Information with count I Burglary While In Possession of a Firearm; count II

27  First Degree Kidnapping With Use of a Deadly Weapon; count III Conspiracy to Commit

28  Robbery; count IV Robbery With Use of a Deadly Weapon; count V Battery With Intent to

RECEIVED
NOV 0 2 2005
COUNTY CLERK

P:\WPDOCS\FOF\715\71573101.doc

1  Commit Robbery; count VI Battery With Use of a Deadly Weapon; count VII Coercion With

2  Use of a Deadly Weapon; count VIII Possession of Firearm by Ex-Felon; count IX

3  Possession of Firearm by Ex-Felon.  On March 6, 1998 a jury found Defendant guilty of

4  counts I, III, IV, VI, VII, and IX.

5         2.       On May 18, 1998, Defendant was sentenced on count I to twenty-two to

6  ninety-six months; count III thirteen to sixty months to run consecutively to count I; count

7  IV thirty-five to one hundred fifty-six months plus an equal and consecutive term for the use

8  of a deadly weapon to run consecutive to count III; count VI twenty-four to ninety-six

9  months to run consecutively to count IV; count VII thirteen to sixty months plus an equal

10  and consecutive term for the use of a deadly weapon to run consecutively to count VI; count

11  IX thirteen to sixty months to run consecutively to other counts.  Judgment of conviction was

12  entered on June 17, 1998.

13         3.       Defendant filed a notice of appeal on March 5, 1998.  The appeal was

14  dismissed by the Nevada Supreme Court and remititur issued on June 29, 1999.  Defendant

15  filed a petition for writ of habeas corpus post-conviction and a motion to appoint counsel on

16  May 16, 2005.  The motion to appoint counsel was denied on May 31, 2005.  Thereafter, on

17  June 27, 2005, the State filed a motion to dismiss the petition as untimely and prejudicial to

18  the State.  Defendant responded on July 14, 2005.

19         4.       The matter was before the court on July 19, 2005, but was continued due to

20  representations from Defendant's family that attempts were being made to retain private

21  counsel.  Private counsel was confirmed on July 26, 2005 and a briefing schedule was

22  ordered.

23         5.       Defendant's claims are being brought seven years after the conclusion of his

24  case.  Remititur was issued on the dismissal of Defendant's appeal on June 29, 1999.

25  Consequently, unless good cause is demonstrated, the instant petition is procedurally barred

26  because it is well beyond the one year time limit allowed for requesting post-conviction

27  relief.

28         6.       Addtionally, since more than 5 years has elapsed and the State has pled laches,

2

1    a rebuttable presumption of prejudice to the State arises.

2        7.      Although Defendant makes assertions that, if true, would qualify as an

3    impediment external to the defense and providing a legal excuse, review of the record

4    demonstrates that his claims are unfounded and without merit.  Defendant raises four

5    arguments in his supplemental petition alleging that good cause is present in his case.   First,

6    he claims that new evidence has come to light demonstrating his innocence.  Second, his

7    conviction was obtained through the knowing use of perjured testimony and the suppression

8    of exculpatory evidence.  Third, his right to equal protection under the law was violated

9    when his co-defendant was treated differently several years after conviction.  Finally, he

10   claims that he received ineffective assistance of trial counsel because his charge for

11   possession of a firearm by an ex-felon was not severed from the other charges.  Each of

12   Defendant's four claims are not supported by the record.

13       8.      Defendant's new evidence does not establish a reasonable probability that a

14   different result would have been reached at trial because the statement is not reliable and

15   only attempts to contradict credible trial testimony of at least three witnesses.  There was

16   ample evidence elicited at trial proving that weapons were indeed in the apartment incuding

17   a witness for the defense, whose admissions on cross examination conclusively demonstrated

18   that the co-defendants had taken weapons out of the apartment.  Defendant's new evidence

19   cannot stand up to the evidence presented at trial that guns were taken from the apartment

20   and does not demonstrate his innocence.

21       9.      Additionally, Defendant's witness waited over eight years after the crime was

22   committed to come forward with his statement.  His coming forward now appears to be

23   highly coincidental and leaves us guessing at his true motives.  If he truly felt guilty and

24   wanted to help Defendant, despite the alleged risk of retribution from the victim, he would

25   have done so prior to this time.  Moreover, his story has a low level of believability.

26   Defendant's witness is a friend and fellow inmate of Defendant, and presents a story that

27   directly contradicts credible trial testimony.  Thus, the statement is unreliable and does not

28   demonstrate good cause.

3

10.     Defendant claims that the prosecutor knew that the victim perjured himself when he testified at trial that a gun was given to him by his mother when he told the police earlier that the gun was stolen.  Defendant concludes that the prosecutor in this case was "bent on victory at trial, no matter the cost, [and did] not want [the] alleged victim portrayed like this." (Supp. PWHC p. 17).  However, this claim is unfounded and belied by the record. The police report noted that the victim stated that the shotgun was in fact stolen because another witness had told the police officers that a shotgun fell out of the car and onto the ground as they sped away.  Although Defendant suggests otherwise, given the context of the victim's testimony and the police report, the victim's statement cannot be construed to mean that he was telling the police that he did not own either of the shotguns.  Moreover, the victim testified at trial that he bought the 12-gauge shot gun from a friend and that his mother had given him the .410 shotgun.  There is no evidence to suggest that this testimony is not true and accurate, and Defendant has only misconstrued the facts rather than produce evidence to the contrary.

11.     Defendant claims that perjury was committed when the victim testified that he gave the receipt for the shotgun to the police.  However, he fails to produce any significant evidence to counter the victim's testimony that he gave the receipt to the police.

12.     Furthermore, Defendant glosses over the fact that Villanueva was not required to register any of his weapons except the .38 revolver.  Only firearms that are capable of being concealed must be registered.  Consequently, Defendant's assertions that the State had constructive knowledge that the shotgun was stolen having no receipt and no registration are incorrect.

13.     Defendant claims that the driver of the vehicle received favorable treatment because he was not charged along with Defendant and that such favorable treatment was required to be disclosed at trial when the driver testified.  However, this claim is without merit.  Defendant is incorrect when he states that it is not important that the driver was a defense witness.  The requirement of disclosing benefits given to co-conspirators in exchange for testimony only apply when the State is presenting such testimony.

4

1   Additionally, there is no evidence that any benefit was in fact conferred by not bringing

2   charges against the driver because, based on the facts, it does not appear that the driver had

3   any indication that the co-defendant's were going to do anything but buy marijuana at the

4   victim's apartment.

5       14.   Defendant incorrectly claims that his rights were violated by the Nunc Pro

6   Tunc order that allowed his co-defendant to be admitted into the Going Home Prepared

7   program. Defendant's argument that co-defendants must received the exact same sentence

8   and treatment after sentencing is inaccurate.  There is no rule of law that says that co-

9   defendant's must be given the exact same sentence or receive the same treatment after

10  sentencing.

11      15.   Defendant did not receive ineffective assistance from his trial counsel.

12  Defendant complains that his trial counsel should have at least requested a limiting

13  instruction regarding his possession of a firearm charge.  Defendant's complaint, however,

14  does not demonstrate that his counsel acted so unreasonably such that it would constitute

15  ineffective assistance of counsel.  The worst that can be said of his trial counsel is that he

16  failed to anticipate a decision of the Nevada Supreme Court, which was not rendered until

17  after the trial in this case, but such a failure is not unreasonable so as to constitute ineffective

18  assistance.

19      16.   Additionally, even if it is assumed that his counsel acted deficiently, Defendant

20  has failed to demonstrate that the failure to have a limiting instruction prejudiced him at trial.

21  There was substantial evidence of Defendant's guilt presented at trial and it is not reasonably

22  probable that Defedant would have been acquitted if the instruction had been given.

23      17.   Defendant has not shown good cause to over come the one year time bar.

24      18.   Defendant has not overcome the presumption that his delay of more than five

25  years prejudiced the State.

26  ///

27  ///

28  ///

5

P:\WPDOCS\FOF\715\71573101.doc

## CONCLUSIONS OF LAW

1.    NRS 34.726 provides:

Unless there is good cause shown for delay, a petition that challenges the validity of a judgment or sentence must be filed within 1 year after entry of the judgment of conviction or, if an appeal has been taken from the judgment, within 1 year after the supreme court issues its remittitur.  For the purpose of this subsection, good cause for delay exists if the petitioner demonstrates to the satisfaction of the court:

(a)    That the delay is not the fault of the petitioner; and

(b)    That dismissal of the petition as untimely will unduly prejudice the petitioner.

2.    A defendant not in compliance with procedural bars can still have his petition heard if he demonstrates good cause for his failure to comply.   In order "to demonstrate good cause, a petitioner must show that an impediment external to the defense prevented him or her from complying with the procedural default rules." Hathaway v. State, 119 Nev. 248, 251, 71 P.3d 503, 506 (2003); (citing Pellegrini v. State, 117 Nev. 860, 886-87, 34 P.3d 519, 537 (2001)); Lozada v. State, 110 Nev. 349, 353, 871 P.2d 944, 946 (1994); Passanisi v. Director, 105 Nev. 63, 769 P.2d 72 (1989);  see also Crump v. Warden, 113 Nev. 293, 295, 934 P.2d 247, 252 (1997); Phelps v. Director, 104 Nev. 656, 764 P.2d 1303 (1988).  Such an external impediment could be "that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials' made compliance impracticable".  Hathaway, 71 P.3d at 506 (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645 (1986)); see also Gonzalez, 53 P.3d at 904, (citing Harris v. Warden, 114 Nev. 956, 959-60 n.4, 964 P.2d 785 n.4 (1998)).  A court should not find good cause, however, unless there is a "substantial reason; one that affords a legal excuse." Hathaway, 71 P.3d at 506; (quoting Colley v. State, 105 Nev. 235, 236, 773 P.2d 1229, 1230 (1989)).

3.    In order to adequately establish a basis for a new trial based on newly discovered evidence, the evidence must be: 1) newly discovered; 2) material to the defense; 3) such that even with the exercise of reasonable diligence it could not have been discovered and produced for trial; 4) non-cumulative; 5) such as to render a different result probable upon retrial; 6) not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable; and

6

1   7) the best evidence the case admits.  <u>Sanborn v. State</u>, 107 Nev. 399, 406, 812 P.2d 1279,

2   1284 (1991).

3       4.    NRS 34.800 creates a rebuttable presumption of prejudice to the State if "[a]

4   period exceeding five years between the filing of a judgment of conviction, an order

5   imposing a sentence of imprisonment or a decision on direct appeal of a judgment of

6   conviction and the filing of a petition challenging the validity of a judgment of

7   conviction…."  The statute also requires that the State plead laches in its motion to dismiss

8   the petition. NRS 34.800.

9       5.    An incarcerated person's testimony regarding the guilt or innocence of another

10  inmate is inherently suspect because such testimony can arise from numerous self-serving

11  motives.  <u>See</u> <u>Lobato v. State</u>, 120 Nev. 512, 96 P.3d 765, 770 (2004).

12      6.    The United States Supreme Court, addressing a claim of actual innocence, has

13  stated that a defendant "must show by 'clear and convincing evidence'" that no reasonable

14  juror would have found the Defendant guilty in light of the newly discovered evidence.

15  <u>Calderon v. Thompson</u>, 523 U.S. 538, 560, 118 S.Ct. 1489, 1503 (1998), <u>quoting</u> <u>Sawyer v.</u>

16  <u>Whitley</u>, 505 U.S. 333, 348, 112 S.Ct. 2514, 2523 (1992).

17      7.    The Nevada Supreme Court has held that "It is established that a conviction

18  obtained by the knowing use of perjured testimony is fundamentally unfair and must be set

19  aside if there is any reasonable likelihood that the false testimony could have affected the

20  judgment of the jury.  <u>Riley v. State</u>, 93 Nev. 461, 567 P.2d 475 (1977) (<u>citing</u> <u>Pyle v.</u>

21  <u>Kansas</u>, 317 U.S. 213, 63 S.Ct. 177 (1942); <u>Alcorta v. Texas</u>, 355 U.S. 28, 78 S.Ct. 103

22  (1957); <u>Napue v. Illinois</u>, 360 U.S. 264, 79 S.Ct. 1173 (1959); <u>Miller v. Pate</u>, 386 U.S. 1, 87

23  S.Ct. 785 (1967); <u>Giglio v. United States</u>, 405 U.S. 150, 92 S.Ct. 763 (1972).  Thus, in order

24  for Defendant's claim to be successful, he must show that: 1) perjured testimony was

25  presented at trial; 2) that the prosecutor knew or should have known of the perjury; 3) that

26  there is any reasonable likelihood that the false testimony could have affected the judgment

27  of the jury.

28      8.    In <u>Hargrove v. State</u>, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984), the Nevada

7

1    Supreme Court held that claims asserted in a petition for post-conviction relief must be

2    supported with specific factual allegations, which if true, would entitle the petitioner to

3    relief. "Bare" and "naked" allegations are not sufficient, nor are those belied and repelled by

4    the record. Id. Defendant fails to point to any credible evidence which supports his claims

5    that the State used perjury to obtain his conviction and, thus, they should be denied as belied

6    by the record.

7         9.    There is no rule of law that says that co-defendant's must be given the exact

8    same sentence or receive the same treatment after sentencing. All that is required is that they

9    be convicted under the same statute and given a sentence within the range allowed by the

10   statute. See U.S. v. Leyvas, 446 F.2d 901, 902 (C.A.Cal. 1971).

11        10.   The United States Supreme Court in Strickland v. Washington, 466 U.S. 668,

12   104 S.Ct. 2052 (1984), established the standards for a court to determine when counsel's

13   assistance is so ineffective that it violates the Sixth Amendment of the U.S. Constitution.

14   Strickland laid out a two-pronged test to determine the merits of a defendant's claim of

15   ineffective assistance of counsel: First, the defendant must show that counsel's performance

16   was deficient. This requires showing that counsel made errors so serious that counsel was

17   not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second,

18   the defendant must show that the deficient performance prejudiced the defense. This requires

19   showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial

20   whose result is reliable. Unless a defendant makes both showings, it cannot be said that the

21   conviction resulted from a breakdown in the adversary process that renders the result

22   unreliable. Id. at 687, 2064. The defendant must show that the representations of defense

23   counsel were not within the range of competence demanded of attorneys in criminal cases.

24   Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366 (1985).

25        11.   The Nevada Supreme Court has held that "claims of ineffective assistance of

26   counsel must be reviewed under the 'reasonably effective assistance' standard articulated by

27   the U.S. Supreme Court in Strickland, requiring a defendant to show that counsel's

28   assistance was 'deficient' and that the deficiency prejudiced the defense." Bennett v. State,

1   111 Nev. 1099, 1108, 901 P.2d 676, 682 (1995); Kirksey v. State, 112 Nev. 980, 987, 923

2   P.2d 1102, 1107 (1996). "In meeting the 'prejudice' requirement, the defendant must show a

3   reasonable probability that, but for counsel's errors, the result of the trial would have been

4   different. . . . 'A reasonable probability is a probability sufficient to undermine confidence

5   in the outcome.'" Kirksey, at 988-989 (citing Strickland, 466 U.S. at 694, 104 S.Ct. at

6   2068). Strategy or decisions regarding the conduct of defendant's case are "'virtually

7   unchallengeable absent extraordinary circumstances.'" Doleman v. State, 112 Nev. 843,

8   848, 921 P.2d 278, 280 (1996) (quoting Howard v. State, 106 Nev. 713, 722, 800 P.2d 175,

9   180 (1990). The Court has also held that there is a presumption that trial counsel was

10   effective and fully discharged his duties. Homick v. State, 112 Nev. 304, 310, 913 P.2d

11   1280, 1285 (1996) (citing Davis v. State, 107 Nev. 600, 602, 817 P.2d 1169, 1170 (1991)).

12   "This presumption can only be overcome by strong and convincing proof to the contrary."

13   Id.

14       12.   In Brown v. State, 114 Nev. 1118 (1998), the Nevada Supreme Court

15   mandated that the severance of charges of possession of a firearm by ex-felons from other

16   charges is only to be applied prospectively.

17   ORDER

18       THEREFORE, IT IS HEREBY ORDERED that the Petition for Post-Conviction

19   Relief shall be, and it is, hereby denied.

20       DATED this _2_ day of November, 2005.

21

22                    DISTRICT JUDGE

23

24   DAVID ROGER

25   DISTRICT ATTORNEY
     Nevada Bar #002781

26

27   BY

28       JAMES R. SWEETIN
     Chief Deputy District Attorney
     Nevada Bar #005144

9

EXHIBIT - 07

**Cal Psychiatric Services**
4530 S Eastern Ave Ste 1, Las Vegas, NV 891196181

**Initial Psychiatric Exam Note**

## ENOMA IGBINOVIA
MRN :

Birthday : **1972-12-16**

Visited on: 2022 Sep 13 11:15 (Age at visit: 49 years)

Phone :

Electronically signed by: AKINDELE KOLADE, MD on 2022-09-14 03:30 PM

**History of presenting Illness MODIFIER 95**

Appointment performed via two-way video/audio call with patient's verbal consent due to no physical face to face contact related to COVID-19 emergency.

Enoma is a 49 y/o male patient who presents for an initial evaluation with a chief complaint of PTSD, difficulty acclimating to free society after incarceration, depression, and anxiety. Patient was imprisoned for 23 years and spent 7 of those years in solitary confinement, he was also jumped by other inmates in prison and stabbed in the neck and body multiple times. Patient states he was charged with robbery with a deadly weapon after a drug deal gone bad. Reports he met with a drug dealer to buy marijuana, the dealer started an argument, and ended up pulling a gun on the patient. He states that the dealer called the police and gave a false statement saying the patient robbed him at gunpoint, the patient was arrested and charged with robbery with a deadly weapon and 9 other charges. The DA offered a plea deal that the patient refused as he maintained he did not rob the drug dealer and was sentenced to 23 yrs in prison. Patient reports he felt like he should not be incarcerated and after suffering multiple stab wounds from an attack by other inmates, he was able to escape prison after he was flown out to UMC for treatment. He was apprehended after escaping and was sentenced to 7 yrs solitary confinement. Patient served his full sentence and was released on parole 2 years ago in 2020. He reports PTSD symptoms such as efforts to avoid reminders of the traumatic events that occurred during his incarceration, difficulty concentrating and sleeping, diminished interest in important affairs, intense distress when reminded of the traumas, flashbacks, and hypervigilance. Patient reports difficulty re-entering free society and "does not feel like himself". He experiences heart palpitations, disturbed sleep, paranoia, racing thoughts, and guilt. Reports feelings of fatigue and loss of appetite. Patient describes difficulty falling and staying asleep, "any little noise will wake me up".

Patient describes generalized anxiety and worry about events and activities. His source of anxiety varies but his anxiety is present most days and he finds it difficult to control worry. Patient has had previous episodes of generalized anxiety disorder, he has also been experiencing panic attacks both in prison and after being released. While in prison he received mental health services for anxiety and was prescribed Paxil for panic attacks. States his mental health started to decline rapidly after the start of his solitary confinement and he has not been able to control his anxiety after his release.

He denies inattentive, other symptoms of ADHD. Symptoms of Autism Spectrum Disorder are denied. He describes no dementia symptoms. Symptoms of bingeing, purging, and other indications of an eating disorder are convincingly denied. Symptoms of grief following a serious loss are not present or described. No obsessive, intrusive and persistent thoughts or compulsive, ritualistic acts are reported. A pattern of negativistic, hostile, and defiant behavior is not reported. No hallucinations, delusions, or other symptoms of psychotic process are reported. Patient specifically denies SI/HI and visual hallucination, states he hears voices when he has flashbacks but denies AH.

| PsychSHx | H/o diagnosed depression, anxiety, and PTSD. |
|---|---|

| PsychFHx | Unknown |
|---|---|

**Cal Psychiatric Services**
4530 S Eastern Ave Ste 1, Las Vegas, NV 891196181

**Initial Psychiatric Exam Note**

## ENOMA IGBINOVIA
MRN :

Birthday : **1972-12-16**

Visited on: 2022 Sep 13 11:15 (Age at visit: 49 years)

Phone :

Electronically signed by: AKINDELE KOLADE, MD on 2022-09-14 03:30 PM

| | |
|---|---|
| **PMHx** | **HTN**<br>Currently taking amlodipine for hypertension |
| **Soc Hx** | Patient was incarcerated for 23 after being charged with robbery w/ a deadly weapon, he spent 7 of those years in solitary confinement. He is currently on parole and has to check in with his parole officer every 3 months, his parole ends 06/2024. Patient is originally from Nigeria and grew up there. Currently lives in Las Vegas with his sister and her family. |
| **Medications** | **SEROqueL 50 mg tablet**, 1 tab(s) orally once a day at bedtime<br>**Zoloft 25 mg tablet**, 1 tab(s) orally once a day in the morning |
| **Allergies** | No known allergies |
| **Psychiatric Mental Status Exam** | MENTAL STATUS EXAM:<br><br>General: A&O x 4, appears stated age, good eye contact, groomed, good hygiene, cooperative, engageable.<br><br>Psychomotor Activity: Normal<br><br>Behavior: calm, cooperative and able to engage adequately.<br><br>Attention and Concentration: Normal.<br><br>Speech: normal rate , normal volume, normal tone, normal prosody.<br><br>Affect: Appropriate. Congruent with mood.<br><br>Mood: "depressed, anxious, and paranoid "<br><br>Thought Process: goal directed, linear.<br><br>Thought Content: organized and absent of suicidal or homicidal thoughts, intentions, and plans<br><br>Perception: Does not appear to be reacting to internal or external stimuli. Denies AH/VH<br><br>Insight: Good<br><br>Judgment: Good<br><br>Suicidality and Homicidality: Denies |

## ROS

**Cal Psychiatric Services**
4530 S Eastern Ave Ste 1, Las Vegas, NV 891196181

**Initial Psychiatric Exam Note**

## ENOMA IGBINOVIA
MRN :

Birthday : **1972-12-16**

Visited on: 2022 Sep 13 11:15 (Age at visit: 49 years)

Phone :

Electronically signed by: AKINDELE KOLADE, MD on 2022-09-14 03:30 PM

Psychiatric: (-)change in mood, (+)depression, (+)sadness interfering with function, (+)anxiety, (+)nervousness, (+)sleep disturbance, (-)suicidal ideation, (+)hopelessness, (-)worthlessness, (-)delusions, (-)hallucinations

## Procedures

Time spent on the following activities on the date of the encounter is included in the E/M Codes

Preparing to see the patient (review of test, record). Obtaining and /or reviewing separately obtained history.

Performing medically necessary evaluation. Counselling and educating the patient/family/ caregiver. Ordering Medications, tests, or procedures. Referring and communicating with other healthcare professionals. Documenting clinical information in the electronic health record. Independently interpreting results of tests/labs and communication of results to family and patient. Care coordination

A verbal consent for telehealth services and psychotropic medications was obtained during this tele visit. A written consent will be obtained at the next face to face visit.

Similarly, vital signs and a full mental status exam and/or Aims exam were unable to be obtained during this tele visit and they will be obtained at the next face to face visit as appropriate.

We carefully considered the risks and benefits of continuing the current medications regimen without lab monitoring in the context of COVID-19 and the labs will be obtained when it can be done safely.

Overall acute risk was low given denial of SI/HI and future oriented thinking. Chronic risk remains the same given underlying Mental health issues and psychosocial stressors, all of which will continue to be addressed on the outpatient basis.

Discussed and encouraged to engage in meaningful activities and continue utilizing positive coping skills.

This virtual two-way video/audio encounter was intended to take the place of a face-to-face visit due to extenuating circumstances surrounding COVID-19.

All reasonable attempts to obtain an accurate history/report for this patient were made. However, this visit was conducted solely via two-way video/audio call due to the ongoing Covid crisis.

Due to the limitations of the visit, no documentation signatures or physical exams were obtained/performed. All parties involved in this visit/encounter understand these conditions and offer no further concerns or questions at the conclusion of this visit.

The patient has the ability to obtain any needed point-of-care testing, including vital sign monitoring and laboratory studies.

## Assessment

**Chronic post-traumatic stress disorder (disorder)** (F43.12/309.81) Post-traumatic stress disorder, chronic modified 13 Sep, 2022

**Cal Psychiatric Services**                                    **Initial Psychiatric Exam Note**
4530 S Eastern Ave Ste 1, Las Vegas, NV 891196181

## ENOMA IGBINOVIA
MRN :

Birthday : **1972-12-16**                                Phone :

Visited on: 2022 Sep 13 11:15 (Age at visit: 49 years)      Electronically signed by: AKINDELE KOLADE, MD on 2022-09-14 03:30 PM

**Recurrent major depressive episodes, moderate (disorder)** (F33.1/296.32) Major depressive disorder, recurrent, moderate modified 13 Sep, 2022

**Generalized anxiety disorder (disorder)** (F41.1/300.02) Generalized anxiety disorder modified 13 Sep, 2022

## Plans

**Start Zoloft 25mg for anxiety, depression, and PTSD and titrate as clinical indicators dictates**
**Start Seroquel 50mg for sleep.**
**Refer for therapy**
**Look into post-incarceration re-entry programs.**

Overall treatment plan was discussed with the patient. Patient voiced understanding. Continue to require outpatient treatment and medications.
Risks, benefits, side effects, and alternative treatments regarding prescribed medications were discussed with the patient/family. Patient expressed understanding and provided informed consent to be on aforementioned medications.
Rechecks with PCP for further evaluation and treatment of medical problems. Patient voiced understanding.
Patient was advised to immediately return to clinic, call 911, or go to the nearest ER for worsening symptoms, side effects, thoughts of harming others, or any concerns. Patient verbalized understanding.

Controlled Substances Precautions Discussed: Advised risks of dependence and tolerance. Advised risks of combining with other controlled substances and emphasized importance of taking as prescribed. PMP Reviewed

Discussed importance of regular physical activity and health diet as part of treatment plan.

RISK ASSESSMENT: SUICIDE/VIOLENCE
Current Risk Factors:
No current suicidal or violence risk factors are present.

Suicide Risk Assessment:
Patient denies suicidal ideas or intentions.

Violence Risk:
Based on the risk factors reviewed, patient's current risk of violence is considered Absent or Very Low. There is no homicidal ideation or intention. No aggressive ideation, self-injurious intentions, or ideation within the past six months prior to this instance of treatment. Use of 1st Line Psychosocial care was discussed with Parents/ Patient before initiation and recommendation for antipsychotic treatment in addition to other treatment modalities.

I have assessed the patients suicide risk judging from current presentation, past presentation, and potential to self-harm the risk of imminent suicide appears low at this time

Patient was educated about Metabolic monitoring and the need for annual lab testing with PCP or pediatrician (LDL-c and HbA1c, Blood Glucose, TSH and BMP).

**Cal Psychiatric Services**
4530 S Eastern Ave Ste 1, Las Vegas, NV 891196181

**Initial Psychiatric Exam Note**

**ENOMA IGBINOVIA**
MRN :

Birthday : **1972-12-16**                                         Phone :
Visited on: 2022 Sep 13 11:15 (Age at visit: 49 years)      Electronically signed by: AKINDELE KOLADE, MD on 2022-09-14 03:30 PM

Next Follow-up: 4 weeks or sooner if needed.

EXHIBIT - 08

THE LAW OFFICES OF

# C. CONRAD CLAUS

### ATTORNEY AT LAW



*917-960*
*INP 12-17-*

November 17, 2005

University Medical Center
Attn: Records Dept.
1800 West Charleston Blvd.
Las Vegas, NV 89107

| RE: | *YOUR PATIENT* | : | *IGBINOVIA, ENOMA* |
|-----|-----|---|-----|
| | *D/O/B* | : | *12/16/72* |
| | *S.S. #* | : | *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* |
| | *DATE OF ACCIDENT* | : | *N/A* |

*T# 9851217Y*

Dear Custodian of Records:

This law firm represents Enoma Igbinovia. Mr. Igbinovia has requested that we obtain his medical records from your facility. Enclosed please find a fully executed Authorization to obtain medical records.

At this time, we would request that you send us the following:

1. Copies of your entire file with regard to Mr. Igbinovia's admission December 1998

2. Copies of your statements of charges.

Please send us a statement for the above photocopies and copies of any x-rays, and we will see that it is promptly paid. We would appreciate your prompt attention to this matter.

Thank you in advance for your cooperation.

Sincerely,

RECEIVED BY

DEC 01 2005

MEDICAL RECORDS

C. Conrad Claus, Esq.

NOV 29 2005

**JMC**
IMERSITY MEDICAL CENTER

ACCOUNT NO. 79305869
MEDICAL RECORD NO. 917-960

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ENT NAME | | | ROOM/BED | PREV ENCOUNTER NO. | | | | | |
| | | | | RECEIVED HOSP, SER. IN OTHER HOSP. WITHIN PAST 60 DAYS | | | UNDER NAME | | DATE N/A |
| IGBINOVIA, ENOMA U | | | | EMPLOY OF PAT./PARENT   UNEMPLOYED | | | | | OCCUP. |
| | AGE | SEX | RACE | MARITAL STATUS | ADDRESS OF EMP. | | | | |
| 12/16/72 | 26Y | M | U | UNK | CITY STATE | | | PHONE NO. | HOW LONG |

STAB WOUND NECK

STREET ADDRESS   GENERAL DELIVERY
LAS VEGAS          NV 89129        COUNTY
SOC. SEC. NO. 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

| T | HOSP. SERV. TRC | SMOKE? | CLERK MAF/SBD |
|---|---|---|---|
| LEWIS, TERRY R | | NO. 951 | |

| ADM DATE | | ADM TIME | DISCH DATE | DISCH TIME |
|---|---|---|---|---|
| 12/14/98 | 23:45 | 12/17/98 | 9:47 |

STAB WOUND NECK    ACCID. DATE/ILL. ONSET 12/14/98    TIME OF ACCID
STAB WOUND NECK                                        ICD-9

LOCATION OF ACCID.   INDIAN SPRINGS     BRIEF DESCR.
ADM. SOURCE 1        ADM. TYPE 5
REMARKS

GUARANTOR   NEVADA, STATE PRISON
STREET ADDRESS   PO BOX 208                PHONE NO. 7023865150
CITY STATE   INDIAN SPRINGS, NV 89070      SOC. SEC. NO.

EMPLOYER UNEMPLOYED

NAME 1   PRISONERS/NEVADA STATE        INS. CODE 745
INSURED   NEVADA, STATE PRISON
GROUP NUMBER   DOP # 56141
POLICY OR CERT. NO. 215257955

THIRD INS.



**UMC**
UNIVERSITY MEDICAL CENTER

*Care How Much We Know.*
*Know How Much We Care.*

PATIENT
NAME

ACCOUNT
NUMBER

## CONDITIONS OF ADMISSION, CONSENT FOR TREATMENT AND FINANCIAL AGREEMENT

1. I/We know of the treatment necessary for the patient whose name appears above. I/We understand that doctors furnishing services to the patient are independent contractors and are not employees or agents of the hospital. I/We consent to any x-ray examination; laboratory procedures, including blood, urine, HIV and toxicology testing; anesthesia; medical or surgical treatment or hospital service rendered under the general and special instructions of the physicians. I/We understand that charges will be made for the quick care center, dressings, etc. by the hospital and charges for hospital physician services. Services administered by private or consulting physicians will be billed by them.

2. MEDICAL AND SURGICAL SERVICES: The patient is under the care and supervision of his/her attending physician. It is the responsibility of the hospital and its nursing staff to carry out the instructions of the physician. It is the responsibility of the patient's physician to inform the patient about the medical or surgical treatment, special diagnostic or therapeutic procedures, or hospital services rendered the patient and obtain informed consent.

3. RELEASE OF INFORMATION: I/We authorize the hospital to make available the patient's record, including his/her medical records, to any person or corporation that is or may be liable for any portion of the hospital's charges, including but not limited to insurance companies, health care service plans, worker's compensation carriers, the patient's employer, and utilization review monitoring organizations. I/We also authorize these entities to reveal to the hospital all information the hospital may request. I/We authorize the use of my (the patients) Social Security number for medical device tracking.  (Includes Public Law 93-282).

4. SCIENTIFIC MEDICAL RESEARCH: I/We approve the taking of pictures of medical or surgical progress, and the use of these for scientific or research or research purposes.

5. PERSONAL VALUABLES:  The hospital maintains a safe for keeping of money and valuables; therefore the hospital shall not be liable for the loss or damage to any money, jewelry, glasses, dentures, documents, furs, or other articles of unusual value or small size, unless placed there, and shall not be liable for loss or damage to any other personal property, unless deposited with the hospital for safekeeping. In the event that I am unable to sign for the release of said valuables, I wish to designate: _____ as my representative.

6. _____
FINANCIAL AGREEMENT:  I/We agree that in consideration of the services to be rendered to the patient, individually obligate to pay the account of the hospital according to the regular rates and terms of the hospital.

7. ASSIGNMENT OF INSURANCE BENEFITS:  I/We do assign directly to University Medical Center all insurance benefits, including automobile and homeowners insurance, otherwise payable to me, not to exceed the hospital's regular charges for this period of hospitalization.  I/We appoint the Chief Executive Officer or his/her designee as true and lawful attorney to endorse any checks made payable to me/us for benefits or claims collected under the assignment and to apply any credit balance to any other account I/We may owe the hospital.  I/We accept the financial responsibility for charges not paid by this assignment.

8. FINANCIAL GUARANTY: I/We accept full financial responsibility of the above-named patient's bill and all charges related thereto.  In the event that the Hospital does not collect from the patient, I/We agree to pay the bill and be primarily liable for the bill, and further, agree that demand may initially be made against me/us or patient, or each, at the option of University Medical Center.  I/We further agree to pay attorney's fees and costs incurred in collection of the account and interest at the legal rate.

9. ASSIGNMENT: I/We guarantee payment of all charges incurred for the patient from date of admission until discharge, or removal, including physicians and anesthesiologists fees

10. RETENTION OF RECORDS:  The Hospital will retain all financial details on the patient account for two years from the date of the patient discharge. Patients will receive an itemized statement of charges after their discharge that are to be kept for future use.

11. "Admissions will not be based on race, color, age, sex, national origin, handicapping conditions, or religion.  The gathering of this information is for demographics only, after the decision to admit."

MEDICAID "SAMI" RECIPIENTS: Federal and State statutes require utilization of all other sources before billing Medicaid for Medical Services.  Other sources include private or employer-provided health and accident insurance coverage.

I certify, under penalty of fraud, that I do not have private or employer provided health and accident insurance for myself or my dependents.

For the purposes of obtaining credit, I/We warrant that the above statements are true and complete.  I/We authorize the Hospital to verify any information on this application.  I/We further understand that the Hospital will receive, from time to time, inquiries from others seeking credit experience information about my/our account.  I/WE ACKNOWLEDGE RECEIPT OF AN EQUAL CREDIT OPPORTUNITY ACT NOTICE.
I/WE HAVE READ THESE CONDITIONS AND AGREE TO THEM.  I/WE ALSO CERTIFY THAT HE OR SHE IS THE PATIENT OR RESPONSIBLE PARTY AUTHORIZED BY PATIENT, AND EXECUTES THIS JOINTLY AND SEVERALLY, AND ACCEPT THE TERMS.

UNIVERSITY MEDICAL CENTER IS A TEACHING INSTITUTION.  UNDER THE SUPERVISION OF ATTENDING PHYSICIANS; RESIDENTS, INTERNS, MEDICAL STUDENTS AND POST GRADUATE FELLOWS MAY PARTICIPATE IN THE CARE OF THE PATIENT AS A PART OF THE MEDICAL EDUCATION PROGRAM.

_____          _____          _____
Patient/Parent/Guardian/Conservator              Date                 Guarantor

Patient unable to sign  _____          Witness _____

**MEDICAL RECORDS**

ORIGINAL "ORIGINAL" PHARMACY "PHARMACY" (1) HARD COPY (1) HARD CHART

444 (REV. 9/96)

DATE: 17/17/98

**UMC**
UNIVERSITY MEDICAL CENTER
*Care How Much We Know.*
*Know How Much We Care.*

☐ **UMC - Emergency Department**
1800 W. Charleston Blvd.
Las Vegas, NV 89102
Phone: 383-2000

☐ **Pediatric Emergency Department**
1800 W. Charleston Blvd.
Las Vegas, NV 89102
Phone: 383-2000

**CLINICS**
☐ **Total Life Care**
901 Rancho Lane, Suite 170
Las Vegas, Nevada 89106
Phone: 383-3701    Fax: 384-8566
Hours: 8:30 am - 4:30 pm Monday - Friday

**QUICK CARES**
☐ **Valley View Quick Care**
2760 Lake Sahara Drive, Suite 102
Las Vegas, Nevada 89117
Phone: 363-3535    Fax: 228-9190
Hours 8 am - 5 pm, Monday - Friday

☐ **Primary Care at Nellis**
61 North Nellis Boulevard
Las Vegas, Nevada 89110
Phone: 363-2574    Fax: 258-8471
Hours: 8 am - 8 pm, 7 days/week

☐ **Lakes Quick Care**
2760 Lake Sahara Drive
Las Vegas, Nevada 89117
Phone: 363-3535    Fax: 254-4348
Hours: 8am - 9pm, 7 days/week

☐ **Nellis Quick Care**
61 North Nellis Boulevard
Las Vegas, Nevada 89110
Phone: 644-8701    Fax: 438-8366
Hours: 8am - 8pm, 7 days/week

☐ **Rancho Quick Care**
4331 N. Rancho Drive
Las Vegas, Nevada 89130
Phone: 658-3060    Fax: 645-1589
Hours: 8am - 8pm, 7 days/week

☐ **McCarran Quick Care**
171 E. Russell Road
Las Vegas, Nevada 89119
Phone: 363-3600    Fax: 795-2015
Hours: 24 hours, 7 days/week

☐ **Summerlin Area Quick Care**
2031 N. Buffalo
Las Vegas, Nevada 89128
Phone: 363-2600    Fax: 255-3231
Hours: 8 am - 8 pm, 7 days/week

☐ **Sunset Quick Care**
525 Marks Street
Henderson, Nevada 89014
Phone: 363-6210    Fax:
Hours: 8 am - 8 pm, 7 days/week

☐ **Craig Quick Care**
2202 W. Craig Road
Las Vegas, Nevada 89131
Phone: 363-5270    Fax:
Hours: 8 am - 8 pm, 7 days/week

☐ **CCSN Quick Care**
6375 W. Charleston Boulevard
Las Vegas, Nevada 89102
Phone: 363-6500    Fax: 877-6876
Hours: 8 am - 8 pm, 7 days/week

PATIENT NAME: Igbinovia, Enoma v.

ADDRESS:

CITY                    STATE        ZIP

DATE OF BIRTH    SOCIAL SECURITY NUMBER    PATIENT PHONE

MEDICAL HISTORY    DIAGNOSIS

ALLERGIES

29305369    12/16/98
IGBINOVIA, ENOMA U
DR LEWIS, TERRY R
SS 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 REG 12/14/9b
0745    917-960

LOCATION (ER, 4N) RX WRITTEN    DATE / TIME OF DISCHARGE

HEIGHT _____ WEIGHT _____

## DISCHARGES TO BE WRITTEN 24 HOURS IN ADVANCE

| DRUG AND DOSE | QUANTITY | DIRECTIONS | REF |
|---|---|---|---|
| | | | |

PHYSICIAN'S PHONE/BEEPER NUMBER

DEA #

ORAS0053219

**FOR PHARMACY USE**
☐ DISP. ONLY AS WRITTEN

SIGNATURE OF PHARMACIST CHECKING MEDICATION    SIGNATURE OF PERSON RECEIVING MEDICATION    SIGNATURE OF PATIENT REQUESTING
AND COUNSELING PATIENT                                                                    NON-CHILD PROOF CONTAINER

PHYSICIAN'S SIGNATURE

OTHER INSTRUCTIONS

UNIVERSITY MEDICAL CENTER
OF SOUTHERN NEVADA

PATIENT DISCHARGE INSTRUCTIONS

```
29305869      12/16/7
IGBINOVIA, ENORA U
DR LEWIS, TERRY R
SS 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 REG 12/14/9
0745      917-960
```

UNIT: ___150___

DISCHARGE DATE: ___12/17/98___

REASON FOR HOSPITALIZATION: ___Stab wound Neck___

DOCTOR: ___Lewis___        DOCTOR'S PHONE: ___383-2000___

NEXT DOCTOR'S APPOINTMENT: ___0___

LAB OR X-RAY: ___0___

DIET: ___Reg___        DIETICIAN CONSULTED: YES ____   NO _X_

ACTIVITY: ___as tol.___

ALLERGIES: _____

| MEDICATION | SCHEDULE | PRECAUTIONS |
|---|---|---|
| percocet | | |

FOOD AND DRUG INTERACTION PATIENT EDUCATION FORM REQUIRED: YES ____   NO ____

TREATMENTS, WOUND CARE, ETC: _____

COMPLICATIONS TO WATCH FOR: _____

OTHER (Examples: Social Services, Home Health Care, Ostomy Club, Reach to Recovery): ___ pt. Dc'd back to Jail accompanied by Security___

___Enora Igbinovia___        ___M. Druffin RN___
PATIENT'S SIGNATURE                NURSE'S SIGNATURE

HAS YOUR DOCTOR INSTRUCTED THAT YOU WILL BE RETURNING FOR SURGERY? YES ____   NO ____

IF YES, PLEASE FILL OUT SURGICAL FURLOUGH FORM #1058 - 3/87

PHYSICIAN'S SIGNATURE

White Copy:    Chart
Pink Copy:     Unit
Yellow Copy:   Patient

(ORDER FROM FLOOR STOCK REQUISITION FORM)

FORM 6091001 7/90 - Rev. 11/94

UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA
1800 W CHARLESTON BLVD
LAS VEGAS, NEVADA 89102

DISCHARGE SUMMARY

ADMITTED:          12/14/98

DISCHARGED:        12/17/98

HOSPITAL COURSE: This is a 36-year-old black male who has a stab wound to his left neck, right forearm with the use of an ice pick. He was stabbed by an unknown assailant in the jail.  The patient came to UMC trauma emergency room to evaluate this.

PHYSICAL EXAMINATION:   Examination shows a single stab wound to the left posterior neck in zone 2 and right forearm is a through and through stab wound.  Vital signs are stable and the patient is awake and alert.  NECK:  No jugular venous distention. Post stab wound near the posterior neck PA angle at the zone 2 area at the level of the thyroid cartilage with slight swelling and tenderness.  There is no actual bleeding at the time of examination.  The trachea is felt to be slightly deviated to the right.  The patient had an chest x-ray which was negative.  No hemothorax, no hemorrhage.  CT of the neck shows a jugular hematoma left pharyngeal air pushing midline fracture to the right with moderate soft tissue swelling in the hypopharyngeal area. Barium swallow was obtained to rule out any esophageal injury, was negative without evidence of vascularization.  Bronchoscopic examination was also done to evaluate the thyroid and was negative.  The rest of the evaluation was unremarkable.  The patient was admitted.

IMPRESSION:  This is a 36-year-old black male with stab wound to his right posterior neck, zone 2, and left forearm with no neurologic signs or deficits.  The patient was admitted to the trauma intensive care unit for workup and observation.  Again, his procedures were done on December 14, 1998 and bronchoscopy and esophagoscopy were negative.  The patient was observed in trauma intensive care unit.  He improved significantly.  He was placed on clear liquids and later a regular diet.  He is tolerating diet, is ambulating and will be discharged home with followup visit with surgery and neck service.

| PATIENT: | IGBINOVIA, ENOMA | ACCOUNT #: | 29305869 |
| MR #: | | | |
| ADM. DATE: | 12/14/98 | | |
| JOB #: | 7654 | PHYSICIAN: | TERRY R. LEWIS, MD |
| DD: | 12/17/98 | DICTATED BY: | R. MARCINKEVICIUS, MD |
| DT: | 12/20/98/863 | | |

DISCHARGE SUMMARY
PAGE 1 of 1

# EMERGENCY DEPARTMENT RECORD

UNIVERSITY MEDICAL CENTER

29305869

| PATIENT NAME (LAST, MIDDLE, FIRST) | | SEX | BIRTHDATE | RACE | ADMIT DATE | TIME |
|---|---|---|---|---|---|---|

| PATIENT ADDRESS | STREET | CITY | STATE | ZIP CODE | NEXT OF KIN |
|---|---|---|---|---|---|

SOC. SEC. NO:

| DATE LAST ADMITTED TO UMCSN | UNDER WHAT NAME | HOME PHONE | WORK PHONE |
|---|---|---|---|

WOULD LIKE MY PERSONAL
DOCTOR CALLED

**NAME**

I REQUEST THE E.R. DR.
TO ATTEND:

NURSES NOTES:
ADMITTING COMP.

STAB WOUND NECK

2

| TEMP | PULSE | RESP. | BP |
|---|---|---|---|

SENT BY

FLIGHT FOR LIFE

ALLERGIES

HISTORY & PHYSICAL:

| EKG & LAB ORDERS | | X-RAY ORDERS | OTHER | | TIME | TREATMENT AND MED. ORDERS |
|---|---|---|---|---|---|---|
| EKG | BLOOD GASES | CHEST | | | | |
| RHYTHM STRIP | CBC DIFF | C-SPINE | | | | |
| STATH UA | PANEL 6 | 3 WAY ABD | | | | |
| URINALYSIS | ETOH | CT HEAD c̄ | | | | |
| URINE C&S | PT/PTT | CT HEAD s̄ | | | | |
| HCG | CARDIAC ENZ. | CPK-MB | | | | |
| QUANT BHCG | NUTRITION PANEL | TROPONIN T | | | | |
| WET PREP | AMYLASE | | | | | |
| GC | LIPASE | | | | | |
| CHLAMYDIA | TRAUMA PANEL | | | | | |
| TYPE & RH | | | | | | |
| HOLD CLOT | | | | | | |
| TYPE & CROSS | UNITS | | | | | |
| X-RAY INTERP. | | EKG INTERP. | | | | |

CLINICAL DATA

DISCHARGE PLAN (INFO SHEETS)

**RESTRAINT ORDER**

TIME _____ DATE _____
TYPE: Leather Maximum 6 Point

**Vest**

**Restraint D/C**

TIME _____ DATE _____

SUTURE REMOVAL

DAYS

RX

DIAGNOSIS:

| | TIME | RESPONDED |
|---|---|---|
| | | (TIME) |

PHYSICIAN CALLED:

DISPOSITION:

DOCTOR'S SIGNATURE

HOME: HOSPITAL POLICE OTHER:

P & P 161 (REV. 10-96)

EXHIBIT - 09

FILE

DISTRICT COURT

CLARK COUNTY, NEVADA

THE  STATE OF NEVADA,

        Plaintiff,

vs.

CECIL HARVEY,

        Defendant.

Case No. C146894
Dept No.  XIV

**SUBPOENA DUCES TECUM
(CUSTODIAN OF RECORDS)**

TO:   Clark County Detention Center
      330 S. Casino Center Blvd.
      Las Vegas, Nevada 89101
      Attention: Records (Pat)

    YOU ARE HEREBY COMMANDED that all and singular, business and excuses

set aside, you appear on the 15th day of April by 5:00 p.m. at:

PLACE:    **Graves & Leavitt**
          601 S. Sixth Street
          Las Vegas, NV 89101

    You are required to bring with you at the time of your appearance any items set

forth on the reverse side of this subpoena.  If you fail to attend, you will be deemed

guilty of contempt of Court and liable to pay all losses and damages caused by your

failure to appear and in addition forfeit one hundred and no/100 ($100.00) dollars.

SHIRLEY B. PARRAGUIRRE

CLERK OF COURT

BY: MANDIE ___ DEPUTY    APR 1 _ 2003

        DEPUTY CLERK        DATE

ISSUED AT THE REQUEST OF:

*John J. Graves Jr.*
JOHN J. GRAVES, JR., ESQ.
GRAVES & LEAVITT
601 S. SIXTH STREET
LAS VEGAS, NV 89101
ATTORNEY FOR DEFENDANT
CECIL HARVEY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ITEMS TO BE PRODUCED

All gun registration and collateral records for any pistols, rifles, shotguns, and any other firearms registered to Jose Ignacio Villanueva, DOB: 2/7/77, SCOPE #1305719, and goes by the Social Security Numbers 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, 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, and 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.

1    DISTRICT COURT

2    CLARK COUNTY, NEVADA

3
4    THE  STATE OF NEVADA,                    )    Case No. C146894
                                              )    Dept No.  XIV
              Plaintiff,                      )
5                                             )
     vs.                                      )
6                                             )    **SUBPOENA DUCES TECUM**
     CECIL HARVEY,                            )    **(CUSTODIAN OF RECORDS)**
7                                             )
              Defendant.                      )
8    _____)

9
10   TO:   Las Vegas Metropolitan Police Department
           400 E. Stewart Ave.
           Las Vegas, NV 89101
11         Attention: Gun Detail

12         YOU  ARE  HEREBY  COMMANDED  that  all  and  singular,  business  and

13   excuses set aside, you appear on the 21st day of April by 5:00 p.m. at:

14   PLACE:    Graves & Leavitt
               601 S. Sixth Street
15             Las Vegas, NV 89101

16         You are required to bring with you at the time of your appearance any items set

17   forth on the reverse side of this subpoena.  If you fail to attend, you will be deemed

18   guilty of contempt of Court and liable to pay all losses and damages caused by your

19   failure to appear and in addition forfeit one hundred and no/100 ($100.00) dollars.

20                                         CLERK OF COURT

21
                                        BY: _____  APR 1 6 2003
22                                         DEPUTY CLERK              DATE

23   ISSUED AT THE REQUEST OF:

24                                                   KAREN DEXTER

25   _____
     JOHN J. GRAVES, JR., ESQ.
26   GRAVES & LEAVITT
     601 S. SIXTH STREET
27   LAS VEGAS, NV 89101
     ATTORNEY FOR DEFENDANT
28   CECIL HARVEY

## ITEMS TO BE PRODUCED

All gun registration and collateral records for any pistols, rifles, shotguns, and any other firearms registered to Jose Ignacio Villanueva, DOB: 2/7/77, SCOPE #1305719, and goes by the Social Security Numbers 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, 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, and 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.

APP. 54

# OFFICE OF THE DISTRICT ATTORNEY
## CIVIL DIVISION

April 18, 2003

**DAVID ROGER**
*District Attorney*

**J. CHARLES THOMPSON**
*Assistant District Attorney*

**MICHAEL D. DAVIDSON**
*Assistant District Attorney*

**MARY-ANNE MILLER**
*County Counsel*

**MITCHELL M. COHEN**
*Deputy District Attorney*

John J. Graves, Esq.
GRAVES & LEAVITT
601 South Sixth Street
Las Vegas, Nevada 89101

Re: **State v. Harvey, Cecil**
   Case No. C146894

Dear Mr. Graves:

The Las Vegas Metropolitan Police Department ("LVMPD") is in receipt of your subpoena duces tecum requesting copies of all gun registration and collateral records for any pistols, rifles, shotguns and any other firearms registered to Jose Ignacio Villanueva. Production is to be made to your office on April 21, 2003 by 5:00 p.m.

The sole purpose of a criminal subpoena is to produce evidentiary material for introduction at hearing. The broad scope of the subpoena, as well as the fact that the subpoena directs production to be made at your office rather than an evidentiary hearing, indicates that the subpoena is being used improperly as a discovery device. Moreover, your request encompasses information which is deemed confidential by law. See, NRS 202.3662. No records will be produced, nor will a representative of the Department be appearing at your office on April 21st.

Please make any discovery/ Brady requests directly to the assigned prosecutor, Chief Deputy District Attorney William Hehn. Discovery will be made available upon an adequate showing of materiality. See, Roberts v. State, 110 Nev. 1121, 881 P. 2d 1, 8 (1994) overruled on other grounds; Foster v. State, 116 Nev. 1088, 13 P. 3d 61 (2000); Riddle v. State, 96 Nev. 589, 590, 613 P. 2d 1031 (1980).

APP. 55

Re:  State v. Harvey, Cecil

ve any questions, please feel free to contact me.

Sincerely,

DAVID ROGER
DISTRICT ATTORNEY

By: _____
MITCHELL M. COHEN
Deputy District Attorney

MMC:ab

cc:   Lt. Robert DuVall, Firearms Section
       William Hehn, Chief Deputy District Attorney